N. L. WYMARD and George L. Stark, Receivers of Kemmel and Co., Inc.

v.

McCLOSKEY AND CO., Inc.

Civ. A. No. 28147.

United States District Court
E. D. Pennsylvania.

May 13, 1963

Dennis, Lichtenstein, Cohen & Dennis, Philadelphia, Pa., by Edward Cohen, Philadelphia, Pa., for plaintiffs.

Walter Stein, J. Dress Pannell, Philadelphia, Pa., for defendant.

WOOD, District Judge.

We have before the Court an action by the Receivers of a bankrupt painting contractor to recover money allegedly owed by the McCloskey and Co., Inc., to Kemmel and Co., Inc.,[1] for painting work performed by the bankrupt on a housing project at Fort George G. Meade, Maryland in 1958–1959.

The gist of the action concerns whether this work was performed on a cost-plus basis after great difficulties were encountered by Kemmel in the course of the contract.

We make the following Findings of Fact and Conclusions of Law:

1. Kemmel is a painting contractor incorporated and existing under the laws of the Commonwealth of Pennsylvania.

2. McCloskey is a general contractor incorporated under the laws of the State of Delaware.

3. On June 27, 1957, the United States, the Fort George G. Meade Defense Housing Corporation, Number I, and Anthony P. Miller, Inc., entered into a contract to construct 1000 housing units at Fort George G. Meade, Maryland.[2]

4. Anthony P. Miller, Inc., the eligible builder, subcontracted the construction work to McCloskey and by resolution of its board of directors recognized McCloskey as principal subcontractor with complete responsibility for the work.

5. On July 15, 1957, McCloskey and Kemmel entered into a contract—the subject of this suit—whereby Kemmel

---

1. The parties will hereinafter be referred to as "Kemmel" and "McCloskey."

2. Hereinafter referred to as the "housing contract."

agreed to perform all the painting work on the 1000 housing units.[3]

6. The original consideration agreed upon between the parties was $290,-000.00, and actual work was begun by Kemmel in May of 1958. This contract was subject to the same completion date of May, 1959, contained in the housing contract.

7. In the fall of 1958, Kemmel ran into difficulty in painting the interiors of a group of houses known as the 49–B houses. The plaster walls of these houses were water sensitive to the specified latex paint which had a water base.

8. This paint was approved by the Government and prepared by outside manufacturers for use by Kemmel.

9. When two coats of this paint were applied, the outcome was splotchy and blurred. The brush marks were magnified many times and it produced a distorted finish.

10. This condition prevailed throughout the project and was attributable to the quality of the plaster which resisted the applications of many varieties of paint which were tested repeatedly to find a satisfactory brand to paint the interiors.

11. McCloskey examined the buildings and ordered Kemmel to sandpaper the plaster walls and apply a spackling compound to produce an even surface. The sanding and spackling of these newly plastered walls were not required by the original specifications.

12. Other problems were encountered by Kemmel as the work proceeded. Additional spackling was required when many baseboards were found separated from the walls. Large numbers of Philippine mahogany doors which had been previously painted and stored were found to be damaged. The veneer had fallen off as many as 600 of these doors and they had to be replaced or reglued. These doors were varnished as many as six times by Kemmel. Kitchen doors (250) of a cork composition had to be spackled.

Floors had buckled in many of the houses and plaster which had frozen during the winter fell from the walls, necessitating repainting work not called for in the original specifications. Also, nine to ten thousand door frames had to be repainted by Kemmel, because of poor paint applied by the manufacturer.

13. Many of the homes had been completed before the roads were constructed and dust and dirt had collected on the exteriors of the houses. Kemmel had to repaint all of these houses throughout the camp. As many as 50 men were employed on Saturdays and Sundays to complete this repainting as ordered by McCloskey.

14. A "man day" in the painting trade comprises eight hours and Kemmel originally estimated that it would take 42 men 5600 man days to complete the work. As unforeseen problems arose the work force was increased pursuant to orders from McCloskey until 170 to 180 men were employed by Kemmel and approximately 19,821 man days were consumed in concluding the painting work.

15. When these difficulties became more and more frequent, Mr. John Kemmel, President of Kemmel, contacted Mr. M. H. McCloskey, President of McCloskey, by telephone on January 26, 1959. Subsequently, on February 28, 1959, John Kemmel met with M. H. McCloskey in Philadelphia and related his problems concerning the painting and financial needs to him. M. H. McCloskey assured John Kemmel that he, McCloskey, would solve the problem and see that Kemmel was paid in full.

16. The aforesaid problems did not abate and another meeting was held in March of 1959 at the job site, in the office trailer of McCloskey. Present were M. H. McCloskey, John Kemmel, Thomas McCloskey and James McCloskey, all officers and executives of the parties. Also present were the various supervisors of the respective companies. At this meet-

---

3. Hereinafter referred to as the "subcontract."

ing the painting problems were considered and John Kemmel stated that the extra work was costing him large sums in added labor costs. M. H. McCloskey agreed to pay Kemmel's weekly payroll less ten percent and M. H. McCloskey remitted a $10,000.00 check the following day for this purpose.

17. This payroll arrangement continued for the next few months when another meeting was held in June of 1959, at the job site. The completion date for the project had passed and it had been extended for another month.

At this meeting Kemmel's financial problems and the unforeseen additional work were again discussed. M. H. McCloskey assured John Kemmel that if he would employ more men he would take care of Kemmel's money situation. This promise was made because the interest and penalties against McCloskey were skyrocketing and he was losing money daily because all of the subcontractors had run into trouble and the entire project was in jeopardy.

18. This additional work performed by Kemmel was originally done pursuant to written work orders signed by supervisory personnel of McCloskey. After July of 1959, when the additional painting work continued to increase at an accelerated pace, McCloskey issued oral work orders and declined to sign any written directions for this work.

19. On July 15, 1959, when the situation continued to deteriorate, another meeting between McCloskey and Kemmel was held at the job site. Present were M. H. McCloskey, with his officers and supervisory personnel, and John Kemmel, with his supervisor, R. M. Hummel.

The parties made a tour of some 600 of the houses which had fallen plaster, defective baseboards and replaced unpainted doors which were not the fault of Kemmel. M. H. McCloskey became very upset with these conditions and he directed Kemmel to repaint these houses after the defects were remedied. He further stated to John Kemmel that he would pay everything to get the job done on a cost-plus basis.

20. After this meeting Kemmel employed more men as directed by McCloskey. The painters were working on weekends and legal holidays to complete this work.

21. On October 10, 1959, the parties met again at the job site to consider the exteriors of the houses which had become dirty from the dust of the unpaved roads. Kemmel was ordered to repaint these dirty exteriors even after they had been painted with the specified number of coats.

22. The work was finally completed in November, 1959, some six months after the original completion date of May, 1959, and the parties continued to have financial meetings to determine the amount which Kemmel was entitled to under the modified contract.

23. On December 3, 1959, McCloskey submitted change orders 7 and 8 (Ex. D–6, D–7), in the sum of $23,262.57, to Kemmel for approval as full payment for the additional work performed by Kemmel. These change orders were drawn pursuant to proposals submitted by Kemmel in March and July of 1959 to amend the contract. Kemmel never accepted these change orders in view of the fact that subsequent to his submission of the proposals the unforeseen difficulties continued to occur even after September of 1959. These change orders only reflect a segment of the work ultimately performed by Kemmel to complete the contract.

24. All of the additional work performed by Kemmel was done pursuant to M. H. McCloskey's blanket order to get the job done and forget the cost.

25. M. H. McCloskey, himself, never objected to the number of additional men employed by Kemmel, and, further, he never objected to the workmanship or materials used by Kemmel. In fact, there never was any question raised in regard to the various invoices submitted to McCloskey. This is corroborated by the voluntary payment of $62,282.24

made by McCloskey on behalf of Kemmel to the Union Welfare Fund and various trade creditors, even after this suit was instituted.

26. McCloskey in the course of the contract made direct payments to Kemmel in the sum of $530,297.62.

27. Anthony P. Miller, Inc., at the request of McCloskey, and for and on behalf of Kemmel, presented by letter dated October 30, 1959, to the District Engineer, as the Contracting Officer, of the Army Department, in Baltimore, Maryland, the dispute between McCloskey and Kemmel involving a claim in the amount equal to $586,130.00, predicated upon and including the items and amounts of the invoice of Kemmel to McCloskey dated October 30, 1959 for the painting work alleged by Kemmel to have been performed upon the housing project in *excess* of that prescribed by the specifications for painting under the housing contract as amended.

28. This $586,130.00 when added to the original contract price of $290,000.00 equals a sum of $876,000.00, which is approximately the amount of cost and profit allowable which from the evidence we find McCloskey agreed to pay to Kemmel.

29. The contracting officer felt that he lacked jurisdiction to consider the claim because there was no privity of contract between the Government and McCloskey and Kemmel.

In our prior decision in this case we held that the matter before the Board of Contract Appeals was whether Anthony P. Miller, Inc., had the right to have the housing contract amended to give Miller the right to receive from the Government additional sums of money for work performed under the changed specifications. While the question in this case is whether Kemmel has the right to recover additional sums from McCloskey under the orally modified subcontract. We reached the conclusion that the matter before the Board of Contract Appeals was not an arbitration of the dispute between Kemmel and McCloskey. Wymard v. McCloskey and Co., Inc., D.C., 190 F.Supp. 420, 423, 426, aff'd. per curiam 292 F.2d 839 (3 Cir., 1961).

30. We find the following charges for the work performed by Kemmel to be established by the evidence:

| | | |
|---|---|---|
| Labor | $525,622.97 | (NT141) |
| Profit @ 10% | 52,562.29 | (10%-NT491) |
| Overhead @ 15% | 78,843.44 | (15%-NT491) |
| Taxes and insurance | 47,834.36 | (NT452) |
| Material | 95,430.45 | (NT163) |
| Handling charge @ 10% | 9,543.05 | (10%-NT491) |
| Welfare Fund | 15,857.30 | (NT152) |
| Labor Travel expense | 38,232.37 | (NT141) |
| Total | $863,926.23 | |

31. McCloskey is entitled to a credit of $592,579.86 for sums already paid to or in behalf of Kemmel.

32. The plaintiff Receivers are entitled to the sum of $271,346.37 which is the balance remaining after the aforesaid credit is deducted.

### DISCUSSION

Kemmel and McCloskey entered into a written agreement to paint 1000 houses at Fort George G. Meade, Maryland for the sum of $290,000.00. This painting was to be performed according to very detailed specifications. At the very inception of the work it became evident that the materials supplied to Kemmel by these specifications were inadequate for the job. The construction work performed by the various trades was deficient in such basic matters as the plaster on the walls and the installation of wood-

work. Constant testing and experimentation was done with the paint used by Kemmel until the chemists arrived at a satisfactory mixture for the plaster walls. Kemmel was compelled to apply as many as four to five coats of paint beyond the three specified on many surfaces.

The unstable conditions prevalent on this project were ably demonstrated by the testimony of James McCloskey, Vice President, at NT356, 358, 360 (plaster and paint difficulties) and NT428 (damage by other trades). An accurate description of the entire project was offered by the testimony of Thomas McCloskey, President of the defendant company, who admitted that:

"* * * The thing (job) was in such a state of flux that I don't think anybody, we included, or Kemmel, or the Corps of Engineers had any idea where that darn thing was going to end or what the total costs would be when we were finished." (NT472)

██ The law is crystal clear that a written contract may be modified orally. Consolidated Tile & Slate Co. v. Fox, 410 Pa. 336, 341, 189 A.2d 228 (1963). Even where the contract provides that any non-written modification will not be recognized. Wagner v. Graziano Construction Co., 390 Pa. 445, 448, 136 A.2d 82 (1957). Such a contract may be modified, changed or a new one substituted for it and this may be established by parol evidence showing either an express agreement or actions necessarily involving alterations. Consolidated Tile & Slate Co. v. Fox, supra, and Bartl v. Crawford Door Sales Co., 394 Pa. 512, 516, 147 A.2d 399 (1959).

██ Herein, Kemmel has proved an express agreement between M. H. McCloskey and himself to modify the written contract by an oral agreement to pay for the work on a cost-plus basis. The evidence has established substantial alterations in the amount of work which Kemmel was required to perform under the contract. This is supported by the fact that McCloskey has already paid Kemmel a sum which is *twice* the original contract price. McCloskey received consideration for all this extra work, insofar as Kemmel's actions were aimed at keeping to a minimum the interest and penalties which were being assessed against McCloskey for failure to complete the work on schedule.

The validity of this claim was further demonstrated by McCloskey's action in filing the claim with the Government, in the name of Anthony P. Miller, Inc., on behalf of Kemmel for the sum of $586,-130.00, which included an allowance for profit of twelve percent. All of Kemmel's records were opened to McCloskey for verification and they were audited by a certified public accountant who found them to be in order with some minor differences.

McCloskey attempts now to discredit Kemmel's workmanship by alleging that the major part of this repainting work was occasioned by Kemmel's inferior work. For this proposition he offers a series of letters addressed to Anthony P. Miller, Inc., from the Army which deal in part with the painting work (Ex. D–18–33). Many of these letters only reflect the very conditions which created the extra work eventually performed by Kemmel. Some of the letters deal with specified paint which did not meet the Government requirements. Others concern the prime coats of paint showing through on the plaster walls which have already been established as defective.

Also, McCloskey contends that these complaints were transmitted to Kemmel via punch lists which were directions to Kemmel to refinish previously painted surfaces (Ex. D–34). A punch list is simply a compilation of direct repainting orders to Kemmel without any explanation as to the cause of the repainting. There was abundant evidence that much of this repainting was caused by defective workmanship of other subcontractors, such as, the plasterers, carpenters and electricians. These bald directions

to repaint are not, in and of themselves, proof that Kemmel's work was substantially inferior as to cause the corrective repainting which resulted.

We think it is significant that the man whose directions were directly responsible for this modified contract never appeared to testify. We continued the trial to enable one defense witness to return from a vacation. The very size of the amount in issue warranted the amplification of this record by Mr. M. H. McCloskey in some regard. Also, we take note of the fact that Mr. Howard Swope, McCloskey's superintendent on the project, never testified. This individual attended all the meetings and knew more about this work than anyone else. His testimony would have been invaluable, but for some unknown reason we have not had the benefit of his knowledge.

Finally, we find no merit in the defendant's counterclaim and it is dismissed.

## CONCLUSIONS OF LAW *

1. We have jurisdiction of the parties and the subject matter.

2. That a valid written agreement for the performance of painting work on a "Capehart Housing Project" at Fort George G. Meade, Maryland was entered into under date of July 15, 1957, between Kemmel and McCloskey.

3. That the written agreement of July 15, 1957, was modified by an oral agreement entered into on or about July 15, 1959, which modification provided that all painting work performed by Kemmel be paid for on a "cost-plus" basis.

4. That there is due and owing to the plaintiff Receivers the sum of $271,-346.37.

5. That the counterclaim of the defendant must be dismissed.

6. That the verdict is in favor of the plaintiff Receivers in the sum of $271,-346.37.

ORDER

And now, this 13th day of May, 1963, judgment is entered in favor of the plaintiff Receivers in the sum of $271,346.37, with interest at six percent from the date of this judgment; and it is further ordered that the defendant's counterclaim is dismissed.