**In re Leonard FRANKS, Debtor.**

**Bankruptcy No. 88–12793S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 31, 1989.

Jeffrey Sheridan Toaltoan, Philadelphia, Pa., for debtor.

Melvyn S. Mantz, Doylestown, Pa., for American Express.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Before us in the instant Chapter 13 bankruptcy case is the Objection of the Debtor, LEONARD FRANKS, to an unsecured Proof of Claim in the amount of $47,429.45 filed by the AMERICAN EXPRESS TRAVEL RELATED SERVICES CO. (hereinafter referred to as "American Express"). We find that the Debtor's transfer of a business, of which a major activity was sale of American Express money-orders and in which he was a partner, to a corporation, about two years prior to the time that the present claims of American Express arose, absolves him from liability as to those claims. This conclusion is supported by our findings that (1) the Trust Agreement between the parties does not appear to render the Debtor's business liable to American Express for actions that occurred after the business was sold; and (2), assuming *arguendo* that the Trust Agreement's terms did render him so liable, American Express waived the provision of the Trust Agreement requiring that any assignment of the business must be in writing and is therefore equitably estopped from rendering the Debtor liable on the basis of a failure to provide the said written notice. We also believe that American Express failed to establish the validity of most of its claims in any event.

The Debtor filed his bankruptcy petition on July 30, 1988. On September 6, 1988, American Express filed the Proof of Claim in issue, attaching thereto an Addendum breaking down its claim, totaling $47,-429.45, into $31,598.57 Principal, $9,511.17 Interest, and $6,319.71 Attorney's Fees. Also attached was an Arbitration Award of May 19, 1988, in C.A. No. 86–2943 in this district court in favor of American Express and against the Debtor and one Diane Murray, individually and doing business as "Wynnefield Check Cashier," with a notation that the Debtor only had appealed this award. Consequently, despite the award, no judgment had been entered in favor of American Express in this matter as of the date of the bankruptcy filing.

On September 19, 1988, the Debtor filed the instant Objection, attacking the claim as disputed in its entirety. After two continuances, the matter came before us for a hearing on December 15, 1988. Testifying at that time, on the Debtor's behalf, were the Debtor himself and his daughter, Sharon Franks Jenkins. American Express called George Yochmovitz, Esquire, the custodian of its records, and Joseph W. Richardson, its agent who serviced the money-order business during the pertinent time-period. After a lengthy hearing, we entered an order allowing the parties until January 6, 1989 (the Debtor), and January 20, 1989 (American Express), to file Briefs supporting their respective positions, which they did in timely fashion.

Ms. Jenkins testified that she was the clerk and principal employee of the business throughout its duration. On January 16, 1979, the Debtor and Ms. Murray, a

partner of the Debtor in this venture who was described as simply a "friend," in their capacity as partners of "Wynnfield [sic] Check Casher" (hereinafter this business is referred to by the proper spelling of the neighborhood of the City of Philadelphia designated thereby, *i.e.*, "Wynne field") executed a form Trust Agreement and Appointment of Agent for Sale of American Express Money Orders with American Express (hereinafter "the Trust Agreement"). The Trust Agreement was obviously a form prepared solely by American Express. The portions of the Trust Agreement pertinent to this controversy are paragraphs 9, 10, 12, 13, and 14 which, though quite lengthy, are quoted herein in full as follows:

9. Term of Agreement. This agreement shall continue in force until terminated by either party by six months written notice to the other, but no such notice shall be given during the first year following the date of this agreement. Notwithstanding the foregoing, American Express may terminate this agreement at any time without cause by written notice or, if it has reason to believe that the financial condition of the Agent is not sound.

10. Assignments, Amendments, etc. This agreement may not be assigned by Agent without the written consent of American Express and may be modified only by an agreement in writing, signed in either case on behalf of American Express by an official of the Money Order Operation. No other employee of American Express has authority to modify or waive any term of this agreement.

. . . . .

12. Termination. In the event of termination for any cause, Agent shall immediately pay over to American Express all of the Trust Funds (which shall be the full amount of all Money Orders issued plus the American Express share of all customer charges), and shall return to American Express all unsold Money Orders and any equipment, display material or other property furnished to Agent by American Express, all of which equip-

ment, display material, etc. shall at all times remain the property of American Express and may be removed by American Express at any time without notice to Agent. All such Trust Funds and Money Orders shall, until remitted to American Express, continue to be held IN TRUST for American Express.

13. Change of Ownership. This Agreement shall be binding upon Agent, his successors, administrators, executors and assign. Agent agrees that he shall give notice of the existence of this Agreement to any purchaser, transferee, assignee, etc., of Agent's business. Such notice shall be given in writing, with a copy furnished to American Express at the same time Agent executes a contract of transaction, as herein described. In the event the Agent fails to give the notice herein required and/or fails to require the purchaser, transferee or assignee to assume the obligations of this Agreement, Agent shall be liable to American Express for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchase, transferee, or assignee has agreed to assume the obligations of this Agreement.

14. Defaults, Breaches, etc. In the event Agent defaults in the prompt and complete performance of its obligations hereunder or fails to promptly pay American Express all sums and amounts payable hereunder and American Express refers this Agreement to an outside attorney for purposes of instituting legal action for the collection of such sums and amounts, Agent shall pay court costs and attorney fees of 25% of the sums and amounts which it failed to pay, which amount shall be added to Agent's obligations hereunder.

The Debtor initially played an active role in the business and had previously owned a grocery store and tavern for about ten years, although his education had gone no further than the sixth grade and he stated that he cannot read very well. However, in 1980, he severely injured his back in a fall at his home and, being limited in his activi-

ties as a result, sold the business to a corporate entity named Wynne Check Cashing, Inc. (hereinafter "Wynne"), of which the principal was his wife, Marion Franks, for $2,000.00. This transaction was memorialized by an Agreement of Sale of October 1, 1980, in which the vendor was identified as "Leonard Franks T/A Wynnefield Check Cashing Agency" and which was signed, for the vendor, only by the Debtor and not Ms. Murray. Although this transaction was therefore a bit homespun, there is no suggestion that it was anything other than legitimate and in no sense contrived to unfairly benefit or prejudice any party.

A key element of the controversy is the Debtor's contention that, on October 4 or October 5, 1980, he called Mr. Richardson and informed him of the sale of the business, to which Mr. Richardson answered that he would take care of the matter insofar as American Express was concerned. The Debtor further testified that, a week later, he called Mr. Richardson again and was again reassured in the same manner by him. It is uncontested that neither the Debtor, nor anyone on his behalf, ever sent any written notice confirming the change of ownership of the business to American Express, and that American Express never gave its consent to the sale of the business in writing. Mr. Richardson, in this testimony, originally stated that he "doesn't recall" these conversations, but thereafter, on prompting from counsel, stated that he definitely never received any such called from the Debtor. The Debtor, who appeared in substantial back pain at the hearing, was, in our view, more credible on this point than Mr. Richardson, the latter of whom is presently retired and impressed us as less reliable in his recollections than the Debtor. We therefore find that the calls referenced above were in fact made by the Debtor, and that the debtor, given his marginal literacy, reasonably relied on Mr. Richardson to inform him of any other requirements to effect the transfer of the Trust Agreement to the new corporate entity. Receiving no such instructions, he reasonably concluded that no further actions on his or Wynnefield's part were necessary to effect the transfer insofar as the rela-

tionship of the business to American Express was concerned.

The relationship between the check-cashing business and American Express over the years proceeding without any complaints on either side, and Mr. Richardson made only three or four occasional, amiable "spot checks" to the business through 1982. There were only a few scattered written communications between the parties, and none appear to evince the awareness, on the part of American Express, that the business was transferred. However, in September, 1982, a discrepancy arose regarding $15,990.48 due to American Express from Wynne in the period from July to September, 1982. This dispute was quickly resolved when Wynne discovered its error in failing to remit this sum, and it immediately rectified same by sending $15,990.48 to American Express.

In January, 1983, a further dispute arose as to whether a check from Wynne in payment to American Express in the amount of $3,076.57, originally returned for insufficient funds, was subsequently paid when and if redeposited by American Express. This dispute was not resolved by Mr. Richardson's visit to Wynne's place of business on January 20, 1983. In fact, that visit terminated with Mr. Richardson's "closing" Wynne as an agent of American Express and taking all of its unused money orders with him.

There is no evidence that any written notice was sent from American Express to Wynne indicating that the parties' relationship was ended or that any specific demand was sent from American Express to Wynne regarding any sum due, such as the more than $31,000.00 delinquent amount claimed at present, was ever dispatched. Ms. Jenkins stated that she had no indication of the delinquency now in issue until March, 1983, when she was provided by American Express with voluminous printouts relating to numerous money orders for which no payments had allegedly been received. At the hearing, Ms. Jenkins produced copies of receipts of all of the hundreds of money orders in issue, and checks and bank statements which purported to establish that

every payment on account of these money orders which was allegedly due to American Express had in fact been remitted to it by Wynne. Unfortunately, she was able to produce only a bank statement as to the originally-disputed sum of $3,076.57, the entries on which appear to support American Express' claim that this payment was not made; the front only of one check for $3,667.83; and only a stub in Wynne's check book for a payment of $8,814.76. American Express accurately points out that payments of these sums, totaling $15,-559.16, has not been conclusively established by Wynne. However, on the other hand, American Express has produced only masses of print-outs to establish that an outstanding balance of over double that sum ($31,598.57) exists, and it presented no real rebuttal that payments were made, per the records which Ms. Jenkins laboriously identified at the hearing, for the balance of $16,039.41 alleged to be due.

No evidence regarding the computation of interest nor the actual legal services performed on behalf of American Express or attorney's fees paid by it to counsel was produced at the hearing.

The Debtor, as indicated, produced mountains of documentary evidence and copious oral testimony supporting his proposition that he personally did not owe any sum to American Express. The burden was therefore squarely placed upon American Express to prove the validity of all aspects of its claim, just as if it were proving its case as the plaintiff in a lawsuit. *See, e.g., In re Jordan*, 91 B.R. 673, 676, 682–84 (Bankr.E.D.Pa.1988); *In re Celona*, 90 B.R. 104, 109 (Bankr.E.D.Pa.1988); and *In re Lewis*, 80 B.R. 39, 41 (Bankr.E.D.Pa.1987).

■ This was, of course, the same burden which American Express was obliged to bear—and did to the satisfaction of the arbitration panel—at the federal arbitration hearing. However, the very fact that the arbitration panel apparently awarded American Express *everything* it asked for, when it appears to us that its base claim could be no more than $15,559.16 and the other aspects of its claims were questionable, causes us to place little weight on the decision of the arbitrators. In any event, no judgment was entered, and the award is therefore in no sense conclusive in determining the validity of the claim of American Express in this Court. *Compare, e.g., Heiser v. Woodruff*, 327 U.S. 726, 732–37, 66 S.Ct. 853, 856–57, 90 L.Ed. 970 (1946); and *In re Gulph Woods Corp.*, 84 B.R. 961, 970 (Bankr.E.D.Pa.1988) (unappealed judgments may be conclusive of the validity of proofs of claims).

■ Our analysis of the liability of the Debtor for the alleged 1982 defalcations of Wynne as to American Express begins with the observation that there is no question that the Debtor did sell the business to Wynne two years before the liability in issue arose. There is no allegation that this sale transaction was accomplished for any bad faith purpose, or, specifically, to evade any liability which the Debtor might have had to American Express. American Express has not asserted any grounds for setting aside this transfer. We believe that, generally, a vendor of a business is not liable for obligations of the business that arise after he has sold it and involve transactions concerning which the vendor has made no undertaking and that, in their entirety, arose only after the sale has taken place. *Compare Parish Mfg. Corp. v. Martin–Perry Corp.*, 285 Pa. 131, 137–38, 131 A. 710, 712 (1926); 6A C.J.S. 753–54 (1975) (assignor of contract in progress cannot relieve himself of his own undertaking by assignment).

These observations cause us to carefully examine the Trust Agreement and determine whether any clauses in it would alter our normal expectations that the vendor is not liable and render the Debtor liable to American Express for the post-sale obligations of his vendee, Wynne. American Express points to paragraphs 10 and 13 of the Trust Agreement as its bases for establishing liability of the Debtor.

In construing these provisions of the Trust Agreement, we must recall, initially, that the Trust Agreement is a form adhesion contract prepared solely by American Express. Therefore, its terms must be construed, wherever ambiguous, strictly

against American Express. *See, e.g., Jordan, supra,* 91 B.R. at 678–79; *In re Leedy Mortgage Co.,* 76 B.R. 440, 445–46 (Bankr. E.D.Pa.1987); and *In re United Nesco Container Corp.,* 68 B.R. 970, 974 (Bankr. E.D.Pa.1987). *Compare In re Temp–Way Corp.,* 82 B.R. 747, 751 (Bankr.E.D.Pa. 1988).

Paragraph 10 of the Trust Agreement, quoted at page 348 *supra,* states, *inter alia,* that the Trust Agreement may be assigned only if written consent of an official of American Express' Money Order Operation approves the Assignment in writing. This clause, if enforced, would preclude the assignment of the rights and obligations of Wynnefield under the Trust Agreement to Wynne, since it is uncontested that no such written agreement of any sort was established to have been elicited from American Express concerning the assignment of the Trust Agreement to Wynne. However, paragraph 10 is silent as to the legal ramifications of an imperfect assignment. This paragraph certainly does *not* state, as American Express would apparently have us read it, that the purported assignor of an imperfect assignment remains liable for all obligations of his purported assignee arising thereafter.

In its Brief, American Express suggests that the Debtor, by his failure to elicit the requisite written assent to the assignment, "did not terminate his legal responsibilities under the Agreement" and, having "violated the Trust Agreement by failing to give notice of an assignment of the Trust Agreement, ... is liable to American Express for all monies due...." Memorandum of Law of American Express Travel Related Services Co., Inc., at 4, 5. Sandwiched in the midst of these statements is a full quotation of paragraph 13 of the Trust Agreement. Therefore, we infer that American Express contends that paragraph 13 of the Trust Agreement is the provision which renders an assignor liable for the obligations of his putative assignee when it has not given assent to the assignment. We do not agree that this paragraph has this effect. The first three sentences of paragraph 13 (quoted at page 348 *supra*) oblige the assignor to provide

notice of its obligations under the Trust Agreement to the *assignee* in writing, with a copy to American Express. Although no such written notice was provided, we note that the operations of the business remained at all times in the hands of Ms. Jenkins. Therefore, there would not appear to be any question that Wynne, as assignee, *recognized* that it assumed all of the obligations of Wynnefield under the Trust Agreement. There is no dispute between American Express and Wynne on that score.

The last, rather convoluted sentence of paragraph 13 renders the imperfect assignor liable to American Express, but only (1) in the event that the assignor has not notified the assignee of its obligations under the Trust Agreement; and (2) to the extent that damages result to American Express *as a consequence of the failure of the assignee to assume these obligations.* In the final phrase, the liability of the assignor is further limited to only damages arising *prior* to the assignee's assumption of the obligations of the Agreement.

We believe that the impediments to invocation of paragraph 13 by American Express here as a basis for rendering Wynnefield and the Debtor liable to it for Wynne's defalcations are its failure to establish that Wynne had not agreed to assume the obligations of the Debtor's business under the Trust Agreement and its failure to establish that its losses were suffered solely as a result of Wynne's failure to assume those obligations. As we indicated above, it seems apparent to us that Wynne, operated by Ms. Jenkins, as had been Wynnefield, its predecessor, *did* agree, at least tacitly, to assume all of the obligations of Wynnefield under the Trust Agreement, long prior to the time that any problems regarding obligations of Wynne to American Express arose in late 1982. This being so, paragraph 13 would not support a cause of action of American Express against the Debtor.

We find no other provision in the Trust Agreement which renders an assignor of such an Agreement liable to American Express for the acts of its assignee. It might

be contended that the imperfect assignment by Wynnefield effected a termination of the Agreement. However, paragraph 12, also quoted at page 348 *supra*, creates no special liability for assignors of businesses on termination of their contracts with American Express. Moreover, any termination was imperfect, as it was not effected in writing, as required by paragraph nine of the Trust Agreement. Furthermore, American Express indicated its own lack of concern for the specific provisions of the Trust Agreement by failing to give written notice of *its* termination of its relationship with Wynne in January, 1983.[1] If anything, this would seem a far more serious breach of the terms of the Trust Agreement than any failures to send written notices on the part of Wynnefield.

The foregoing analysis leads us to question whether Wynnefield and the Debtor have any liability to American Express, even if we enforced all terms of the Trust Agreement against them. The Trust Agreement, if read strictly against American Express, would not seem to create any such rights. We underscore that our analysis might well differ if we believed that the alleged obligations of Wynne to American Express in issue were traceable to Wynnefield's tenure as owner of the business, or that the transfer of the business to Wynne had any air of impropriety or of an attempt to take unfair advantage of American Express about it. Certainly, in such instances, the equities would be different. However, no such instances exist here. From an equitable standpoint, we would characterize American Express' claims against the Debtor here as an attempt to impose a liability upon him from which he was otherwise totally free simply because he failed to comply with the requirement, which is both entirely technical and substantively unrelated to the issue at hand, to provide American Express with written notice of the sale of his business to Wynne.

In their briefing, both parties appear to assume that the Debtor's potential liability turns upon whether the written consent requirement of paragraph 10 was waived by Mr. Richardson's advice to the Debtor, in the two telephone notices to him by the Debtor of the sale of the business to Wynne in October, 1980, that no further notice of the sale was required. In this regard, we note that, in Pennsylvania,

> [t]he law is crystal clear that a written contract may be modified orally. *Consolidated Tile & Slate Co. v. Fox*, 410 Pa. 336, 341, 189 A.2d 228 (1963). Even where the contract provides that any non-written modification will not be recognized. *Wagner v. Graziano Construction Co.*, 390 Pa. 445, 448, 136 A.2d 82 (1957). Such a contract may be modified, changed or a new one substituted for it and this may be established by parol evidence showing either an express agreement or actions necessarily involving alterations. *Consolidated Tile & Slate Co. v. Fox, supra*, and *Bartl v. Crawford Door Sales Co.*, 394 Pa. 512, 516, 147 A.2d 399 (1959).

*Wymard v. McCloskey & Co.*, 217 F.Supp. 143, 147 (E.D.Pa.1963). *Accord, First Nat'l Bank of PA. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987); *Barnhart v. Dollar Rent A Car Systems, Inc.*, 595 F.2d 914, 919 (3d Cir.1979); *Cedrone v. Unity Savings Ass'n*, 609 F.Supp. 250, 254 (E.D.Pa.1985); *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 557–59, 244 A.2d 10, 15 (1968); and *Wagner, supra. Cf. In re DSC Industries, Inc.*, 79 B.R. 244, 248–49 (Bankr.E.D. Pa.1987), *remanded* 94 B.R. 42, 47–48 (E.D.Pa.1988) (applying New Jersey Law).

American Express, in addressing this argument, cites to *Leasing Service Corp. v. Benson*, 317 Pa.Super. 439, 449–50, 464 A.2d 402, 407 (1983), where it is said that the law "generally upholds the validity and sanctity of no-oral modification clauses [unless] ... there is evidence of a waiver of the requirement that modifications be writ-

---

**1.** We note that a failure of a contracting party to provide a requisite written notice of termination to the other party can give rise to liability on its part. *See In re Chapman,* 77 B.R. 1, 5–6 (Bankr.

E.D.Pa.1987). There is, however, no evidence that Wynne has ever pursued any claim against American Express as a result of these actions.

ten to be effective;" and *C.I.T. Corp. v. Jonnet*, 419 Pa. 435, 439, 214 A.2d 620, 622 (1965), where Justice Musmanno, in typically colorful fashion, stated that, "[i]f such a loose and rambling averment [as in that case was purported to modify a contract] were to be accepted as wiping out a solemn stipulation in a written contract, then such stipulations would last no longer than the vapor written by airplanes in the sky." *See also In re Slaw Construction Co.*, 28 B.R. 540, 543 (Bankr.E.D.Pa.1983).

However, we believe that there are several responses to these authorities. First, we note that, when the facts were somewhat different, and the equities were in favor of the party seeking to avoid bondage to the strict terms of a written contract, Justice Musmanno, in *Wagner, supra*, was equally colorful in stating that "[t]here is nothing sacrosanct about a written agreement ... The most ironclad written contract can always be cut into by the acetylene torch of parol modification supported by adequate proof ... The hand that pens a writing may not gag the mouths of assenting parties ...," 390 Pa. at 448, 136 A.2d at 83, and "[m]inds may meet in the field of oral concord as well as between the borders of parchment or paper," 390 Pa. at 449, 136 A.2d at 84.

The facts here are readily distinguishable from those in *Leasing Service, C.I.T. Corp.*, and *Slaw Construction.* The waiver in issue is of a term which, as we indicated in our discussion at pages 351–52 *supra,* of little material consequence in the parties' contract. There is considerable question in our mind, as indicated therein, as to whether anything in the Trust Agreement actually would render the Debtor liable to American Express for the obligations of Wynne in any event. Clearly, it should be easier to find a waiver of a non-material, purely-technical contract provision, as we believe the requirement of paragraph 10 to be under the facts here, than one which is highly significant. *See Cedar Points Apartments v. Cedar Point Inv. Corp.*, 693 F.2d 748, 755 (8th Cir.1982) (clause requiring written consent to an assignment not enforced because "its existence ... does not form an essential part of the exchange for the promisor's performance"). *Compare Temp–Way, supra*, 82 B.R. at 752–53 (court enforces contract provision found to indeed be material despite arguments to the contrary). The element of lack of materiality is supported by our observation that *neither* party appears to have adhered to *any* of the written notice requirements in the Trust Agreement.

In contrast to *Leasing Service, supra*, the element of waiver *does* arise here, due to Mr. Richardson's assurances to the Debtor that his oral notices of the sale of the business were sufficient for American Express' purposes. In fact, it appears to us that all of the elements necessary to establish an equitable estoppel against American Express arising out of these telephone exchanges are present here. *See E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 330 (3d Cir.1980); *Schifalacqua v. CNA Ins.*, 567 F.2d 1255, 1258 (3d Cir. 1977); *GAF Corp. v. Amchem Products, Inc.*, 399 F.Supp. 647, 657–59 (E.D.Pa. 1975), *rev'd on other grounds*, 570 F.2d 457 (3d Cir.1978); and *In re Haines*, 10 B.R. 856, 858–59 (Bankr.E.D.Pa.1981). These elements are that the party sought to be bound by waiver acts or is silent when he ought to speak, anticipates that the other is relying upon him, and possesses or should possess the requisite knowledge to provide correct information; and that the party raising the claim of estoppel lacks knowledge of the accuracy of the facts in issue, relies on the party sought to be estopped, and changes his position in reliance upon what he is told (or not told). *See GAF Corp.*, 399 F.Supp. at 657, and cases cited therein. Here, Mr. Richardson knew or should have known that the assignment request was technically required to have been in writing, yet he advised the Debtor that his oral notices were sufficient, in full awareness that these representations would be relied upon by the Debtor. The Debtor, whose literacy was limited, clearly lacked knowledge of the Trust Agreement provisions, and relied upon the advice of Mr. Richardson to his detriment, as he would have doubtless supplied the requisite written notice of same had it been

requested by Mr. Richardson. The elements of an equitable estoppel would therefore appear to be present. We note that estoppel has been specifically held to run against parties which manifest intentions to disregard such restrictions on assignments. *See Cedar Point, supra,* 693 F.2d at 754–76; and RESTATEMENT (SECOND) OF CONTRACTS § 323 (1981).

■ Therefore, we agree with the Debtor that the requirement that the notice of assignment be in writing was waived by Mr. Richardson on behalf of American Express. Hence, even if we believed that the terms of the Trust Agreement technically rendered Wynnefield and the Debtor liable to American Express, which we do not, we would not enforce that requirement as to the Debtor here. We therefore conclude that the debtor is not liable to American Express for any of the alleged obligations of Wynne to American Express arising in the latter part of 1982.

Having reached this conclusion, we need not further explore the parties' mountains of documents to ascertain the precise amount of any liability of Wynne to American Express. Nor need we consider whether the award of prejudgment interest and attorney's fees was justified. We shall, nevertheless, comment on these issues, but do so very briefly.

First, we do not believe that the documentation supports a finding of a liability of Wynne in the full amount claimed by Mr. Yochmowitz of $31,724.57, or of the $31,598.57 recited in the Proof of Claim and awarded by the arbitrators. We have several reasons for questioning this liability. As the Debtor points out, as of August, 1982, the only controversy between the parties involved an obligation of Wynne to American Express in the amount of $15,-990.00, which Wynne promptly satisfied. How a discrepancy as large as $31,000.00 could have developed in such a short time thereafter, after a long prior period of tranquility, is unexplained. The vague testimony of Mr. Richardson and the documentation of American Express, answered by the more specific submissions of Ms. Jenkins evidencing payments which appear to clear-

ly rebut any deficiency in excess of $15,-559.16, did little to inspire our confidence in the accuracy of the calculations of American Express. Only the liability for the payment check which apparently did not clear Wynne's account in the amount of $3,076.57, the dispute over which was the only issue which set off the parties' controversy, appears clear.

The claim for pre-judgment interest is clearly dependent upon the validity of the underlying claim of American Express against Wynne. Moreover, pre-judgment interest is recoverable as a matter of right, under Pennsylvania law, only where the defendant commits a breach of a contract to pay a definite sum of money. *See Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh,* 776 F.2d 1174, 1177–80 (3d Cir.1985); *Ambromovage v. United Mine Workers of America,* 726 F.2d 972, 980–84 (3d Cir.1984); *Fernandez v. Levin,* 519 Pa. 375, 548 A.2d 1191, 1193–94 (1988); and *In re Art Shirt, Ltd.,* 68 B.R. 316, 325 (Bankr.E.D.Pa.1986), *aff'd,* 93 B.R. 333 (E.D.Pa.1988). The claim of American Express here is so indefinite that we question whether any award of pre-judgment interest would be appropriate.

■ Finally, the claim for any attorney's fees measured at twenty-five (25%) percent of the obligations due, simply because of the presence of the twenty-five (25%) percent figure of measurement in paragraph 14 of the Trust Agreement (see page 348 *supra* ), is extremely questionable. Contract clauses authorizing the fixing of attorney's fees by measurement of a certain fixed percentage of a debt are properly interpreted as caps on fees allowable, not licenses to routinely impose the amount which results from a computation of that given percentage. *See In re Johnson–Allen,* 67 B.R. 968, 976–77 (Bankr.E.D.Pa. 1986); and *In re Cosby,* 33 B.R. 949, 950 (Bankr.E.D.Pa.1983). The upward limit of an amount of attorney's fees includable in a proof of claim, as is true generally under the law of Pennsylvania, is an amount that is reasonable, irrespective of the provisions of the parties' contract. *See In re Nickleberry,* 76 B.R. 413, 421–23 & n. 11 (Bankr.

E.D.Pa.1987). Here, there is absolutely no evidence to support the conclusion that a fee in the amount of $6,319.71 is "reasonable." [2]

Our conclusion that there are questions as to the legitimacy of all aspects of the merits of the claim of American Express against Wynne, let alone against Wynnefield and the Debtor, lends to our comfort in concluding that its Proof of Claim, against the Debtor here, should be disallowed. An Order so stating will accordingly be entered by us.

We are, however, somewhat distressed to note that the Debtor has apparently not yet filed his Schedules and that, therefore, no meeting of creditors pursuant to 11 U.S.C. § 341 has been scheduled in this case, as we directed in paragraph one of our Order of December 16, 1988. We therefore include mandates in our Order designed to rectify this situation.

---

**2.** There is also a question as to whether such fees are allowable as an aspect of the clearly unsecured claim of American Express, in light of the presence of 11 U.S.C. § 506(b). *See In re*

*Vitelli, Vitelli v. Cheltenham Federal Savings & Loan Ass'n,* 93 B.R. 889, 894–97 (Bankr.E.D.Pa. 1988); and *Nickleberry, supra,* 76 B.R. at 423–26.