**N. L. WYMARD and George L. Stark, Receivers of Kemmel & Co., Inc., Debtor**

v.

**McCLOSKEY & CO., Inc.**

**Civ. A. No. 28147.**

United States District Court
E. D. Pennsylvania.

Dec. 22, 1960.

Dennis, Lichtenstein, Cohen & Dennis, by Edward Cohen, Philadelphia, Pa., for plaintiffs.

J. Dress Pannell, Philadelphia, Pa., for defendant.

WOOD, District Judge.

This is a suit on a contract for money due and owing Kemmel & Co., Inc. by McCloskey & Co., Inc.[1] The plaintiffs are the receivers of Kemmel, having been appointed by the Court on March 2, 1960. It appears that the primary cause of the bankruptcy of Kemmel has been the defendant's refusal to pay Kemmel the alleged debt.

The defendant has moved to stay this suit pending the outcome of certain arbitration procedures provided for in the contract between the parties: According to the contract, plaintiffs may not resort to the courts until the arbitration procedures have been exhausted.

The question presented for our determination is whether Kemmel, by an enforceable contractual agreement, has precluded itself from litigating this disputed debt until the matter now before an arbitrator is resolved. The nature of the question will appear more clearly as the

---

1. The parties will hereinafter be referred to as "Kemmel" and "McCloskey."

history of the case is outlined. At present, we emphasize the importance of distinguishing between the precise dispute between Kemmel and McCloskey, and the issue which has been presented to the arbitrator. If they are one and the same, we think the motion to stay the suit should be granted. If they are different, then resolution of the issue before the arbitrator would not necessarily resolve the dispute between Kemmel and McCloskey. We think the case is an interesting and unusual one, and that it merits a thorough discussion.

## I. History of the Case

The United States Government required the construction of housing units at Fort George G. Meade in Maryland, and selected as the principal contractor to perform the work Anthony P. Miller, Inc. On June 27, 1957, the United States, the Fort George G. Meade Defense Housing Corporation Number I, and Anthony P. Miller, Inc., entered into a contract for this construction.[2] Anthony P. Miller, Inc., subcontracted the construction work to McCloskey. On July 15, 1957, McCloskey and Kemmel entered into a contract—the subject of this suit—whereby Kemmel agreed to perform all the painting work on the housing units.[3]

The housing contract contained plans and specifications for the painting work, designating the type of paint to be used and the manner of its application. The subcontract between Kemmel and McCloskey referred to and incorporated by reference those provisions of the housing contract pertaining to the painting specifications.[4] The subcontract provided that McCloskey would pay Kemmel the sum of $290,000 for the painting job. The method of payment was spelled out in some detail. On the 25th day of each month, Kemmel was to submit to McCloskey an itemized estimate of the work done and the materials furnished for that month and submit a bill accordingly. On the 15th day of the following month, McCloskey agreed to pay Kemmel 90% of the itemized bill. The balance due was to be paid by McCloskey within thirty days from the completion of the project.

On or about May 1, 1958, Kemmel began work on the housing project. After the interior painting for the first group of housing units had been completed, the representatives of the Contracting Officer concluded that the painting was not giving the type of results intended. After some negotiation, the specifications of the housing contract with respect to the painting were changed, and the amount to be paid the principal contractor for the entire job was also changed accordingly.[5] McCloskey and Kemmel then *orally* agreed that Kemmel would continue the painting work under the new specifications and that Kemmel would be compensated therefor *on a cost-plus basis*. (We consider this step an important link in the chain of events.) No specific amount over and above the original contract price was agreed on as between Kemmel and McCloskey for the now more extensive and expensive painting. Nor was any agreement made with respect to the *manner* of payment under the new cost-plus arrangement. Apparently, the parties considered the provisions of the subcontract as to the manner of payment to be still in force.

The information we have as to what transpired as Kemmel proceeded with the painting under the changed specifications is meager; we know that McCloskey made some payments to Kemmel, amounting *in toto* to $530,297.32, and that Kemmel claimed over $400,000 in addition. As these unpaid balances mounted, Kemmel finally presented this dispute to the Contracting Officer as hereafter related.

The subcontract contained a provision governing the settlement of disputes between Kemmel and McCloskey, and it was

2. Hereinafter referred to as "housing contract."

3. Hereinafter referred to as "subcontract."

4. See Article I of the subcontract.

5. See letter of Contracting Officer to Anthony P. Miller, Inc., dated November 19, 1959.

this provision that Kemmel relied upon when it wrote to the Contracting Officer concerning the amount of unpaid balances then claimed to be due it from Mc-Closkey. The subcontract provided as follows:

"Article XIII

"13:01. In case of any dispute between the Principal Subcontractor and the Subcontractor in regard to matters arising out of this Subcontract * * * the same shall be submitted to and decided by the Contracting Officer, in accordance with the Disputes Clause of the General Provisions of the Housing Contract, being Paragraph 8 thereof."

and

"Article III

"3:01. No alterations shall be made in the work except upon the written order of the Principal Subcontractor [McCloskey] and the amount to be paid by the Principal Subcontractor * * * by virtue of such alterations shall be stated in said order. Any dispute arising between the Principal Subcontractor and the Subcontractor [Kemmel] as to the amount to be paid * * * shall be determined in accordance with the Disputes Clause of the General Provisions of the Housing Contract, being Paragraph 8 thereof * * *"

This provision of the subcontract clearly governed the dispute then (and now) existing between Kemmel and McCloskey.

It is to be noted also that Paragraph 8 of the Housing Contract provided as follows:

" * * * any dispute concerning a question of a fact arising under this Housing Contract, * * * which may be adjusted between the eligible-builder [Anthony P. Miller, Inc.] and the Contracting Officer * * * shall be decided by the Contracting Officer * * *"

The Disputes Clause of the Housing Contract then went on to provide the method of appeal from the decision of the Con-

tracting Officer. As we have stated, it was these provisions which guided Kemmel to direct its dispute with McCloskey to the Contracting Officer. What subsequently took place was an exchange of letters between Kemmel and the Contracting Officer and between Anthony P. Miller, Inc., and the Contracting Officer. These letters bring us to the question presented by the motion now before us, and are crucial in the resolution of that question.

II. The Attempt to Arbitrate the Dispute between Kemmel and Mc-Closkey

The first letter from Kemmel to the Contracting Officer concerning the large sums claimed by Kemmel to be due from McCloskey was dated August 20, 1959. That letter stated *inter alia* as follows:

"We should like to advise you that McCloskey and Co., the principal subcontractor in the matter above is in default under its contract with us in that it has failed to make payment to us of our amounts due as provided in Article 4, section 403 thereof * * * We herewith offer to promptly meet with you and to discuss any alleged violation of our contract with McCloskey & Co. *as provided in article 13 of our contract with McCloskey and Co.,* * * as well as McCloskey and Co.'s failure to make payments to us in the amounts provided in our contract with them." [Emphasis supplied.]

In reply to this letter, the Contracting Officer wrote Kemmel on September 1, 1959, as follows:

"Receipt is acknowledged of your letter of 20 August 1959 requesting my intervention as Contracting Officer, in your dispute with McCloskey & Co. * * * Since there is no privity of contract between the Government and either your company or McCloskey and Co., *it would be inappropriate,* and inconsistent with the Government's interest, *for me to accept jurisdiction in this matter.*" [Emphasis supplied.]

Kemmel contends that these letters show conclusively that Kemmel complied with the arbitration provisions of the subcontract but that the Contracting Officer refused to act as arbitrator. Since the subcontract makes no provision for such an occurrence, Kemmel contends that it may now resort to the courts, either for litigation of the dispute or for the appointment of another arbitrator.

We think that these letters show clearly that Kemmel sought arbitration according to the subcontract and that the designated arbitrator refused to take jurisdiction of disputes between Kemmel and McCloskey. Our conclusion is fortified by the Contracting Officer's second letter to Kemmel's counsel, Thomas J. Mullaney, dated November 9, 1959. In that letter, the Contracting Officer stated:

"Receipt is acknowledged of your letter of 3 November 1959, *notifying this office of your claim against McCloskey & Co. in the alleged total amount of $425,640.00*, and demanding that this amount be withheld by me out of payments due * * * Enclosed * * * is copy of my letter of 1 September 1959 to your client, explaining the relationship of the parties to the above transaction, *and the government's reasons for declining to act as arbiter of this disputed claim.*" [Emphasis supplied.]

At this point in the history of this case it is difficult to see what possible ground McCloskey could have for its present contention that Kemmel may not resort to the courts now because it did not comply with the subcontract's requirement that disputes between Kemmel and McCloskey be submitted to the Contracting Officer for arbitration. McCloskey's argument rests on what subsequently took place between the Contracting Officer and Anthony P. Miller, Inc.

On October 30, 1959, Anthony P. Miller, Inc., wrote to the Contracting Officer as follows:

"There is presented * * * on behalf of Kemmel and Company, Inc. * * * a claim for added compensation in connection with additional or extra work performed and a request for a Construction Change * * * in the estimated amount of $586,130.00 * * *" (The letter sketched the background of events leading to the claim.)

It should be noted that this letter did not in terms request the Contracting Officer to actually arbitrate anything or to resolve any dispute between Kemmel and McCloskey. *What the letter asked for was an additional sum of money from the Government to be paid to Anthony P. Miller, Inc.* The Contracting. Officer's reply of November 19, 1959, refusing the claim, clarifies the nature of Miller's request. It was stated in that letter that Miller's claim was without merit because, among other reasons,

"Revisions *were made* by the Government in the original painting specifications resulting in additional work. The additional costs for this work *were recognized and payment provided for the* same under constructions changes 7 and 8." [Emphasis supplied.]

and

"Any additional painting work actually accomplished without change orders was done without any direction, written or oral, by the government * * *"

It is clear from this letter of the Contracting Officer that as between the Government and the principal contractor, Anthony P. Miller, Inc., the changes in the painting specifications were accompanied by an increase in the contract price for the work to be done. Miller agreed to do the work as described in the changed specifications for a specific increase in the contract price. On the other hand, Miller's sub-subcontractor, Kemmel, agreed with subcontractor McCloskey to actually perform the work under the changed specifications *on a*

*cost-plus basis.* Apparently the costs of this work amounted to more than the increment in the housing contract price provided for by construction changes 7 and 8.[6] But the Government was not and is not now responsible for or concerned with the unanticipated costs incurred by Kemmel. McCloskey *is*, however, responsible (or so it appears) since McCloskey agreed to pay Kemmel *on a cost-plus basis.* We think it beyond dispute that the action of Anthony P. Miller, Inc., in "presenting a claim on behalf of Kemmel" to the Contracting Officer, and in appealing the decision of the Contracting Officer (which denied this claim in full), cannot be construed as a presentation for arbitration of the dispute between Kemmel and McCloskey.

One final point remains for disposal. Although neither counsel discussed the bearing of the provisions of the subcontract concerning the *method of payment* of Kemmel by McCloskey on the motion before us, we deem them pertinent in this regard. Article IV of the subcontract, as mentioned previously, provided that McCloskey would pay Kemmel ninety percent of the estimated monthly figure submitted by Kemmel by the 15th day of the following month—*"when and as payment thereof shall have been received by the Principal Subcontractor* [McCloskey]." This provision made Kemmel's right to receive payment for work done *contingent upon* McCloskey's having received payment from Miller, and apparently Miller would not pay McCloskey until Miller had been paid by the Government. This provision *could*, in our view, be a reason for requiring Kemmel to await the outcome of the appeal of Miller now pending before the Board of Contract Appeals before Kemmel's right to payment from McCloskey could be determined. However, we think this is a question to be determined at the trial of the law suit filed by Kemmel, and not a question which requires Kemmel to await the decision of the Board of Contract Appeals before Kemmel may resort to the courts for resolution of its claim against McCloskey.

III. Summary and Decision

■ Kemmel agreed in the subcontract to submit to the Contracting Officer all disputes between it and McCloskey arising under the subcontract, including disputes over the amount due from McCloskey for additional work performed by Kemmel under any changed specifications. (See Article XIII and Article III of the subcontract.) This provision for arbitration by the Contracting Officer was a legally enforceable contractual provision, and under the law, Kemmel could not sue McCloskey in a court of law for any dispute arising under the subcontract until Kemmel had first exhausted the arbitration procedures provided for in the subcontract—including the procedure for appeal from the decision of the Contracting Officer.

■ A dispute arose under the subcontract between Kemmel and McCloskey which was covered by the arbitration provisions of that contract. The dispute is whether or not McCloskey is required under the subcontract (and the oral modification thereof providing for payment to Kemmel on a cost-plus basis) to pay Kemmel $418,150.32.

Kemmel complied with the arbitration provisions of the subcontract and attempted to submit to the Contracting Officer for his decision this dispute. (See letter of August 20, 1959, from Kemmel to Contracting Officer; letters of September 1, 1959, and November 9, 1959—all quoted in part above.) The Contracting Officer refused to act as arbiter of the dispute between Kemmel and McCloskey because neither company was in privity of contract with the United States Government.

Thereafter, the principal contractor, Anthony P. Miller, Inc., presented to the Contracting Officer a claim for additional money in the form of a request that the Government issue a construction change in the housing contract. The effect of

---

6. See letter of Contracting Officer to Anthony P. Miller, Inc., dated November 19, 1959.

190 F.Supp.—27½

such a construction change would have been that the contract price would have been increased and the principal contractor would have therefore received additional sums of money from the Government. Presumably, such additional sums would have been passed down the line of contractors, from Miller to McCloskey to Kemmel.

However, even if the Board of Contract Appeals does order a construction change (thus reversing the decision of the Contracting Officer) and even if the resulting payments from the Government to Miller were passed on to Kemmel, there is nothing in the subcontract requiring Kemmel to await that hoped-for result. Having exhausted the arbitration procedures provided for in the subcontract, Kemmel can now litigate its dispute with McCloskey in a court of law.

The Contracting Officer refused the claim of Miller in full for the reason that the Government had already issued one construction change in the housing contract when the painting specifications were changed. Miller appealed the Contracting Officer's decision. The appeal is now pending before the Board of Contract Appeals of the Department of the Army.

Kemmel filed suit against McCloskey in this Court. The motion before us is to stay the action on the ground that Kemmel is bound by the arbitration provisions of the subcontract to await the outcome of the matter pending before the Board of Contract Appeals (the Miller claim).

We think that the matter before the Board of Contract Appeals is a totally different issue than the dispute between Kemmel and McCloskey that forms the basis of the lawsuit. The former involves the question of whether the principal contractor, Anthony P. Miller, Inc., has the right to have the housing contract amended to give Miller the right to receive from the Government additional sums of money for work performed under the changed specifications. The latter involves the question of whether Kemmel has the right to be paid some $400,000

by McCloskey under the subcontract as orally modified. Therefore, the matter before the Board of Contract Appeals *is not an arbitration of the dispute between Kemmel and McCloskey.* Kemmel complied with the arbitration provisions of the subcontract. When the designated arbiter, the Contracting Officer, refused to take jurisdiction of the dispute, Kemmel became free to litigate the matter in the courts.

■ Although the provisions of the subcontract making Kemmel's right to payment by McCloskey contingent upon McCloskey's payment by Miller *may* require Kemmel to await the outcome of the matter before the Board of Contract Appeals before its right to payment can be adjudicated, this is a matter to be determined at the trial of the lawsuit. Furthermore, there is no evidence in the record before us that McColskey *was not in fact paid* for the work for which Kemmel is now claiming the $400,000.

We wish to emphasize that we are making no decision on the right of Kemmel to be paid any money by McCloskey. We are deciding *only* that Kemmel has the right to litigate its dispute in the courts now.

We have gone into some detail in deciding this question largely because of the case of Fanderlik-Locke Co. et al. v. United States for Use of Morgan et al., 10 Cir., 285 F.2d 939. That case was factually similar to the case before us, and the Court held that the proceeding should be stayed pending the final disposition of the claim before the Board of Appeals for the Air Force. We do not know what subtleties and facts not recited in the opinion of that case might have influenced the learned judges in reaching their decision. Of this we are sure, however, that in the Fanderlik-Locke Co. et al. v. United States for Use of Morgan et al., case supra, the subcontractor had not *attempted to comply with the arbitration provisions* which the Circuit Court thought were a part of the subcontract. We think that this is a sufficiently distinguishing factor between that case and the case at bar for us to decline here to

follow the decision in Fanderlik-Locke Co., etc., *supra.*

### Order

For the foregoing reasons, the defendant's motion to stay proceedings is hereby denied.