**SHOOK OF WEST VIRGINIA, INC., Plaintiff,**

v.

**YORK CITY SEWER AUTHORITY, Defendant.**

**No. CV–90–1718.**

United States District Court, M.D. Pennsylvania.

Feb. 8, 1991.

John Havas, Larry L. Miller, Foulkrod, Reynolds & Havas, Harrisburg, Pa., Donald G. Gavin, J. Kent Holland, Jr., Owen J. Shean, Wickwire Gavin, P.C., Vienna, Va., for plaintiff.

William R. Scullion, David Wm. Bupp, Blakey, Yost, Bupp & Schaumann, York, Pa., Harold I. Rosen, Dorn C. McGrath, III, Jeffrey E. Weinstein, Christopher Louis Rissetto, Mark W. Pritchard, Zorc, Rissetto, Weaver & Rosen, Washington, D.C., for defendant.

**MEMORANDUM**

RAMBO, District Judge.

Before the court is the motion of York City Sewer Authority ("York"), to dismiss this action on the grounds that plaintiff, Shook of West Virginia, Inc. ("Shook") has not exhausted the dispute remedy provided in the construction contract between the parties. York refers to the motion as one to dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The parties' briefs, however, only address grounds for a 12(b)(1) dismissal for failure to exhaust contractual remedies and

the motion will be treated accordingly.[1] Because there is a dearth of case precedent involving the precise issue in this factual context, the court will set forth the background to the action in detail.

THE CONTRACT

In 1987, York was awarded a federal Environmental Protection Agency ("EPA") construction assistance grant for the purpose of modifying York's wastewater treatment plant. Thereafter, on November 12, 1987, York and Shook entered into a contract whereby Shook would perform construction required to renovate two sewage treatment "trains," and perform certain piping and mechanical work. The contract called for Shook's work to progress in three phases, so as to accommodate continuous operation of the existing facilities. The Phase I work was scheduled for completion by January 15, 1989, Phase II work by June 20, 1990, and Phase III work by February 20, 1991. Phase I and Phase II are now completed[2] and Phase III is in progress. During the performance of Shook's work, there have been other contractors performing work on the project under separate contracts with York.

York hired Buchart–Horn, Inc. ("B–H") to serve as Project Engineer and construction manager for the project. Under the contract between York and Shook, B–H was given a wide range of responsibilities. For example, as project engineer, B–H must process applications and make recommendations for payment, review and approve shop drawings, certifications, or samples required by the contract documents, approve change orders, observe work in progress and, when necessary, reject defective work in progress or demand special inspections or testing. What is significant to the instant motion is that the contract also gives B–H authority to make initial decisions on disputes between the parties. A review of the relevant contract language is critical to the determination of how far B–H's authority extends in the dispute resolution process.

ARTICLE 9–ENGINEER'S STATUS DURING CONSTRUCTION

*Owner's Representative:*

9.1 The ENGINEER shall be the OWNER'S representative during the construction period. The duties and responsibilities and the limitations of authority of the ENGINEER as the OWNER'S representative during construction are set forth in Articles 1 through 19 of these General Conditions and shall not be extended without written consent of the OWNER and ENGINEER.

*Clarifications and Interpretations:*

9.3 The ENGINEER will issue with reasonable promptness such written clarifications or interpretations of the Contract Documents (in the form of drawings or otherwise) as he may determine necessary, which shall be consistent with or reasonably inferable from the overall intent of the Contract Documents. If the CONTRACTOR believes that a written clarification and interpretation entitles him to an increase in the Contract Price, he may make a claim therefor as provided in Article 11.

*Decisions and Disagreements:*

9.9 The ENGINEER will be the initial interpreter of the terms and conditions of the Contract Documents and the judge of the performance thereunder. In his capacity as interpreter and judge he will exercise his best efforts to ensure faithful performance by both the OWNER and the CONTRACTOR. He will not show partiality to either and shall not be liable for the result of any interpretation or decision rendered in good faith. Claims, disputes and other matters relating to the execution and progress of the Work or the interpretation of or perform-

---

1. Defendants have also filed motions to stay discovery and for a protective order to stay plaintiff's requested depositions. The court's decision on the motion to dismiss will also dispose of the motions regarding discovery.

2. It is the court's understanding that Shook's work is finished on these phases but that due to the ongoing dispute between the parties, no certificate of substantial completion has been issued.

ance under the Contract Documents shall be referred initially to the ENGINEER for decision, which he shall render in writing within a reasonable time.

## ARTICLE 10–CHANGES IN THE WORK

10.2 The ENGINEER may authorize minor changes or alterations in the Work not involving extra cost and not inconsistent with the overall intent of the Contract Documents. These may be accomplished by a Field Order. If the CONTRACTOR believes that any minor change or alteration authorized by the ENGINEER entitles him to an increase in the Contract Price, he may make a claim therefor as provided in Article 11.

## ARTICLE 11–CHANGE OF CONTRACT PRICE

11.2 The Contract Price may only be changed by a Change Order. Any claim for an increase in the Contract Price, shall be in writing delivered to the OWNER and the ENGINEER within fifteen days of the occurrence of the event giving rise to the claim.[3] Any change in the Contract Price resulting from any such claim shall be incorporated in a Change Order.

11.3. The value of any Work covered by a Change Order or of any claim for an increase or decrease in the Contract Price shall be determined in one of the following ways:

11.3.1 Where the Work involved is covered by unit prices contained in the Contract Documents, by application of unit prices to the quantities of the items involved.

11.3.2 By mutual acceptance of a lump sum.

11.3.3 By cost and a mutually acceptable fixed amount for overhead and profit.

11.3.4 If none of the above methods is agreed upon, the value shall be determined by the ENGINEER on the basis of costs and a percentage for overhead and profit. Costs shall only include labor (payroll, payroll taxes, fringe benefits, workmen's compensation, etc.), materials, equipment, and other incidentals directly related to the Work involved.... In such case and also under paragraph 11.3.3 the CONTRACTOR will submit in form prescribed by the ENGINEER an itemized cost breakdown together with supporting data. (emphasis added).

The mandatory EPA supplemental conditions, which supersede any conflicting provisions in the contract, contain the following disputes provision:

> Except as may be otherwise provided in this subagreement, all claims, counterclaims, disputes, and other matters in question between the recipient and the contractor arising out of or relating to this subagreement or the breach thereof will be decided by arbitration if the parties mutually agree, or in a court of competent jurisdiction within the State in which the recipient is located.

EPA Supplemental Conditions, Paragraph 7.

## THE COMPLAINT

Shook has alleged that it sustained and will continue to sustain increased, uncompensated costs over the life of the project, all as a result of obstacles and events outside of Shook's control. Shook lists obstacles such as delay by other contractors on the job, differing site conditions, extreme weather conditions, and design errors and changes. The majority of Shook's allegations, however, pertain to the actions of B–H, who, as stated, is York's Project Engineer and is the party to whom York claims these disputes now must be referred. Examples of alleged harmful actions by B–H include: unjustified interference, disruptions, and stoppages of Shook's work; extensive revisions to the project plans during construction and concomitant

---

**3.** At this point, the contract between the parties originally contained the following sentence:

"All claims for adjustments in the Contract Price shall be determined by the ENGINEER if the OWNER and the CONTRACTOR cannot otherwise agree on the amount involved."

That sentence was later deleted by Addendum No. 5 to the contract.

refusals to grant added time and compensation for work by Shook related to such revisions; undue refusals to allow substitute materials; baseless insistence upon the use of equipment and materials from certain sources; refusals to issue change orders for extra work B–H demanded or for extra work and delay generated by B–H; and undue refusal to certify substantial completion for separable phases of the project.

Shook claims that B–H's multiple roles as York's design engineer, resident project engineer, and contract administrator caused a conflict of interest and kept B–H from exercising its authority as project engineer impartially, as required by the contract. Shook asserts that it tendered valid and timely change order requests for added time and compensation but York, acting through B–H, refused to grant many of them. Shook requests as relief an equitable adjustment of the contract price, added time for completion, and recovery of approximately $1,350,000.00, which B–H allegedly wrongfully withheld from periodic payments over the life of the project.

## THE MOTION TO DISMISS

York asserts that Section 9.9 of the General Conditions requires Shook to permit B–H to render a decision on the claim prior to bringing suit. York concedes that Shook has submitted the claims to B–H initially but argues that Shook has not provided requested additional documentation, which York urges is required by the contract. Shook counters that it submitted timely change order requests between 1988 and 1990 as problems arose but B–H denied many of the requests. Shook then combined all claims into a three-part Request for Equitable Adjustment, which contained many claims already presented to B–H. The parties agree that Shook submitted Part I in May, 1990, Part II in July, 1990 and Part III in September, 1990 and that B–H has rendered no final decision on any part at this time.

Shook argues that York, through B–H, rejected most of Parts I and II but suggested, nonetheless, that Shook provide additional documentation before a final decision would be given. Shook urges that B–H's requests for additional information are only a dilatory tactic and that B–H has the information necessary to a decision. York concedes that Shook provided some of the documentation needed to review Parts I and II, that B–H found most of Shook's Part I request factually insupportable and that Shook was advised to submit additional information. York argues, however, that Shook has not provided crucial cost information to B–H, and that the review is time-consuming because many of the construction activities it must review took place as long as three years ago. Thus, York contends that Shook has not allowed the disputes process clause to proceed as contemplated by the contract.

## DISCUSSION

■ York's legal rationale for this motion is basically that Pennsylvania's adherence to the plain meaning rule of contract interpretation compels dismissal because the disputes provision clearly and unambiguously requires Shook to permit the project engineer to issue a decision as a prerequisite to litigation. York further relies on decisions involving collective bargaining disputes, in which courts have held that resort to the courts is precluded prior to the exhaustion of administrative, statutorily prescribed, or contractually required collective bargain grievance procedures. Shook, on the other hand, cites several cases for the proposition that a contractual requirement will not be construed as a condition precedent to a right of action in court unless it is clearly and unambiguously stated to be one. Shook argues that this contractual provision does not meet that standard and that, in any event, it has submitted the claims to the engineer initially, as required. Unfortunately, there is a paucity of case law on this issue. The court believes, however, that several principles of law require it to deny York's motion to dismiss this claim.

■ The court's rationale for this decision proceeds from the premise that language in a contract not clearly identified as a condition precedent is presumed not to be one. *Mellon Bank N.A. v. Aetna Business*

*Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980); *Britex Waste Co. v. Nathan Schwab & Sons*, 139 Pa.Super. 474, 12 A.2d 473 (1940). Nowhere can this principle be more important than in construing a provision that would divest a party of the right to have a court hear its claims. Even in the case of arbitration agreements, which courts must liberally construe, a party will not be forced to forego litigation in favor of arbitration unless it is clear he has agreed to do so. *Beck v. Reliance Steel Products Co.*, 860 F.2d 576, 579 (3d Cir. 1988). This basic principle must apply with equal force to an alleged agreement to forego litigation, albeit temporarily, in lieu of a project engineer's decision.

*Aberthaw Constr. Co. Centre Co. Hosp.*, 366 F.Supp. 513 (M.D.Pa.1973), *aff'd*, 503 F.2d 1398 (1974), cited by Shook, is the only decision of a Pennsylvania federal or state court (and one of only two decisions found) that bears resemblance to the case at bar.[4] There, the contract contained an arbitration clause and a clause giving the project architect authority to issue decisions on claims related to interpretation of the contract and execution of the work. *Aberthaw*, 366 F.Supp. at 514. The architect's provision, however, also provided that if the architect failed to make a written decision within ten days of the submission of a request, either party could demand arbitration. The contractor conveyed a claim, by letter to the architect, and the architect responded over a month later with a request for additional supporting documentation. *Id.* The contractor, however, provided no further information and filed a demand for arbitration. *Id.*

The owner argued, *inter alia*, that only matters that had been properly referred to the architect were subject to arbitration. The court, calling the owner's argument an "exhaustion of remedies" argument, stated the following:

> [T]he contract did not specifically make submission of the claim to the architect a condition precedent to arbitration. Even if it were assumed that it be a condition

precedent, it appears that the matter was referred to the architect and no written decision was issued within 10 days. Therefore, ... the matter became arbitrable at that time. The contract imposed no duty upon [contractor] to respond to the architect's subsequent request for clarification of the claim.

*Aberthaw*, 366 F.Supp. at 515. Although the result in *Aberthaw* may have turned on the architect's failure to respond within ten days, the language supports the following proposition: (a) a provision giving authority over initial disputes to an architect or engineer, standing alone, does not create a condition precedent to suit; and (b) even if initial referral were a condition precedent, absent contract language indicating otherwise, a party is not obliged to respond to repeated requests by an engineer or architect for additional information before suit can be brought.

Two decisions from the courts of New York provide added insight into the proper construction of this initial referral clause. In *New York Telephone Co. v. Schumacher & Forelle*, 60 A.D.2d 151, 400 N.Y.S.2d 332 (App.Div.1977), one provision required initial referral of disputes to the project architect. That provision was augmented by another provision that expressly precluded a demand for arbitration before either the architect rendered a decision or ten days had passed since the architect received supporting evidence. With that clause, submission of the claim to the architect *was* held to be a condition precedent to arbitration and the complainant's failure to submit the claim precluded arbitration. *New York Telephone*, 400 N.Y.S.2d at 332–33.

The *New York Telephone* decision stands in contrast to a later New York case, *Mario & Di Bono Plastering Co. v. Rivergate Corp.*, 140 A.D.2d 164, 527 N.Y.S.2d 417 (App.Div.1988). In *Mario & Di Bono*, there was also a contract provision requiring submission of any disputes to the project architect but that provision was not

---

**4.** This court's independent research produced several decisions from other jurisdictions, discussed below, that dealt with similar provisions but which are distinguishable either factually or by additional provisions that clarified the disputes provision.

further defined or limited by other provisions. *Id.*, 527 N.Y.S.2d at 418. As disputes arose during the course of the work, neither of the parties submitted claims to the architect but, rather, discussed them at meetings or in correspondence. *Id.* When the claims remained unresolved, the contractor commenced a court action and the owner moved to dismiss based on the contractor's failure to submit its claims to the architect. The *Mario & Di Bono* court noted that the contract did not define the architect's role in the dispute resolution process.

The court ruled that the architect's provision did not create a condition precedent to suit. The court wrote that, unlike the case of *New York Telephone*, the court:

> could not say here that "[t]here is no ambiguity in the agreement before us [or] ... there is an express limitation on arbitration, viz: initial submission of the contract to the architect." There, [in *New York Telephone*], the contract specified that "no demand for arbitration of any ... claim, dispute, or other matter may be made until the earlier of ... [t]he date on which the architect has rendered his written decision or ... the tenth day after the parties have presented their evidence to the architect ..." In the absence of such a clear, express and unequivocal condition precedent, we decline to hold that plaintiff has waived its right to a day in court to litigate its claims against the general contractor, particularly since the provision for submission to the architect is, at best, a mediation—and not an arbitration—process.

*Mario & Di Bono Plastering*, 527 N.Y.S.2d at 418 (citation omitted).

Other decisions have construed similar disputes provisions that are instructive for the case at bar. For example, in a line of decisions, the New York courts have held that a disputes provision substantially similar to the one in the York/Shook contract is centered only on the operational phases of the contract. Therefore, referral to the architect was not a condition precedent to arbitration or court action brought after performance was ended, whether by sub-

stantial completion or termination of the contract. *See In Re County of Rockland (Primiano Constr. Co.)*, 51 N.Y.2d 1, 431 N.Y.S.2d 478, 409 N.E.2d 951 (1980); *Liebhafsky v. Comstruct Assoc.*, 62 N.Y.2d 439, 478 N.Y.S.2d 252, 466 N.E.2d 844 (1984); *Tsombikos v. Brager*, 147 Misc.2d 995, 559 N.Y.S.2d 460 (Sup.Ct.1990).

The *Tsombikos* court, reviewing the range of the architect's duties, also observed that "it is quite clear that mediation duties were a minor part of the architect's overall duties in supervising this improvement." *Tsombikos*, 559 N.Y.S.2d at 460. Similarly, the *Liebhafsky* court wrote that:

> [T]he architect's role as mediator, to whom all disputes "relating to the execution or progress of the Work or the interpretation of the Contract Documents shall be referred initially," is but one aspect of the Architect's general responsibility to supervise the contract in order to expedite its completion. The essence of our decision ... is that this role terminated once the architect is no longer responsible for supervising the contractor's performance.

*Liebhafsky*, 478 N.Y.S.2d at 252–53, 466 N.E.2d at 844–45. *Compare Board of Educ. v. Hatzel & Buehler*, 156 A.D.2d 684, 549 N.Y.S.2d 447 (1989) (where architect's provision was augmented by one providing: "any claim, dispute, or other matter in question between the Contractor and the Owner referred to the Architect shall be subject to arbitration," submission of claim to architect was condition precedent to arbitration, which contractor failed to fulfill when it initiated request for arbitration without ever submitting claims to architect); *and Julian v. State Highway Admin.*, 63 Md.App. 74, 492 A.2d 308 (1985) (where provision requiring claims to be submitted to engineer was augmented by express provisions that made engineer's decisions final and made right to recover contingent upon such submission of claims, submission of claims was condition precedent to suit).

In the present case, the court is convinced that further referral of Shook's claims to B–H can not be held to be a

condition precedent to this litigation. Here, it is because of provisions that the contract between York and Shook does *not* contain that York's motion must fail. The contract contains no express language precluding arbitration or litigation absent initial referral to the engineer or prior to issuance of the engineer's final decision. Nor does it adequately define the procedures to use or limit the time within which the engineer can retain authority over the claims. The *Bell Telephone Co.* decision instructs that an act or event in a contract must not be construed as a condition precedent unless it is expressly made so or unless it clearly appears to have been the intention of the parties. In no case can this rule be more important than the agreement to forego one's right to bring an action in a court of law. The contract between York and Shook simply does not provide adequate indication of the intent to make submission of the claims to the engineer (or his final decision, which is York's true argument), a condition precedent to the right of litigation or arbitration found in Paragraph 7 of the EPA supplemental provisions.

The court believes that the disputes provision only gives the engineer a mediator's role during the work in progress. It is significant that the disputes provision is within a section titled "Engineer's Status During Construction." A reasonable reading is that it requires Shook to submit to B–H individual claims for additional compensation and similar matters at the time claims arise while the project, or any portion thereof, is in progress. It gives B–H a "reasonable time" within which to provide a written response to Shook's requests. (General Conditions, § 9.9). The contract does not define or limit the "reasonable time" allowed for B–H's decision.

In any event, Shook apparently submitted requests to B–H as problems arose, and many were denied. Moreover, B–H has had at least part of Shook's Request for Equitable Adjustment for nine months. Thus, even if initial referral to B–H were a condition precedent to suit during performance, at this juncture the court would be constrained to hold that Shook has fulfilled the condition. Further, there is no question but that the engineer's role continues only during performance. Arguably, Shook's work is completed on Phase I and II of the project, (despite B–H's refusal to issue a certificate of substantial completion) and nearly completed on Phase III of the project.

The disputes provision, moreover, must be read in conjunction with Article 11, which provides for changes in contract price. It is undisputed that the parties deleted by addendum the sentence that gave the engineer authority to decide disputes over adjustments in the contract price. (General Conditions, § 11.2). This action is primarily a dispute over a change in the contract price. In addition, Article 11 provides that *when* the question of a change in contract price arises, and *if* the parties elect to compute the amount due under certain calculations, the contractor will submit cost information in "form prescribed by the engineer." It is not clear how or if the parties have elected to compute any amount due and, therefore, it is not clear that the engineer's right to prescribe the form in which the contractor must submit cost information has arisen. Article 11, therefore, provides no real support for the argument that Shook must provide additional information to B–H before this suit can be heard.

The court feels compelled to note the cases cited by York. A review of those decisions revealed that they bear either no factual or no legal resemblance to the instant action. For example, York cites to *Findley v. Jones Motor Freight*, 639 F.2d 953 (3d Cir.1981) to argue that Shook is required to exhaust the contractual remedies provided and has not done so. *Findley*, however, involved a union member's claim against a union for breach of the union's duty of representation. As factual background to a union's duty to represent members in grievance procedures, the court merely noted that when a collective bargaining agreement provides mandatory grievance machinery, an employer may raise as a defense the failure to exhaust the prescribed procedures. The failure to

exhaust administrative procedures was not actually an issue. *See Findley*, 639 F.2d at 957. It is notable, moreover, that the grievance procedure alluded to in *Findley* was a statutorily supported quasi-judicial process, which included a panel of arbitrators and fully defined procedural steps. *Pittsburgh Die Sinkers Lodge No. 50 v. Pittsburgh Forgings Co.*, 255 F.Supp. 142 (W.D.Pa.1966), also involved collective bargaining and, again, failure to exhaust grievance procedures is neither the focus of the decision nor discussed in any detail.

*Cunningham v. Prudential Property & Cas. Ins.*, 340 Pa.Super. 130, 489 A.2d 875 (1985) has equally little relevance to the present action. That case involved an insurance contract clause that required arbitration under the Pennsylvania Arbitration Act, established a process for selection of and payment to a panel of arbitrators, and provided for the rules of procedure and evidence applicable to the arbitration. *Id.* at 134–36, 489 A.2d at 878–89. When the insurer refused to arbitrate, the plaintiffs brought an action claiming that such breach of the arbitration agreement entitled them to judgment on the merits. The court dismissed the complaint, with leave to bring an action to compel arbitration. *Id. Westinghouse Elec. Corp. v. Unemployment Comp. Bd. of Rev.*, 187 Pa.Super. 391, 144 A.2d 673 (1958), held that, whether or not a union should have exhausted or did exhaust grievance procedures, Pennsylvania's Unemployment Compensation Law precluded compensating union employees who failed to avail themselves of all available contractual, legal, or equitable dispute remedies prior to ceasing work during a labor dispute.

Finally, *Wymard v. McCloskey & Co.*, 190 F.Supp. 420 (E.D.Pa.1960), involved a subcontract between two subcontractors that purported to incorporate a disputes provisions of a different contract between the primary contractor and the United States Government. The court ruled that the plaintiff subcontractor exhausted the contractual remedies by submitting its dispute to the government contracting officer as required, even though the officer declined to hear it. The court, therefore, would not stay the action pending the outcome of separate arbitration that had arisen between the primary contractor and the government. *Id.* at 422–24. *Wymard*, 190 F.Supp. at 422–23. In sum, it is difficult for the court to see how the cases cited by York should guide the court's disposition of the motion at hand.

One final point is in order. Inasmuch as York would rely on the law related to mandatory grievance procedures in collective bargaining agreements, the court notes that even when a contract clearly directs pursuit of a contractual remedy as a condition precedent to suit, the courts recognize limitations to the obligation to exhaust the remedy. The doctrine of futility excuses exhaustion of grievance procedures where the effort would be wholly futile. *See Glover v. St. Louis–San Francisco Railway Co.*, 393 U.S. 324, 330, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969) (black employees not required to pursue complaint alleging racism through union grievance procedure, where complaint alleged that union and employer acted in concert to deny promotions based on race). In this regard, the dispute now is as much between Shook and B–H as it is between Shook and York. B–H claims it needs more information to decide the claims. Shook denies the same and claims that much of its loss is attributable to B–H. It is clear that Shook cannot obtain the relief it seeks through B–H. In this hostile climate, York could, if it chose, endlessly demand additional information, all the while retaining funds allegedly due Shook. When would B–H's "reasonable time" to issue a decision terminate? The court is mindful that, during that time, Shook would have no parallel right, as in a formal disputes resolution proceeding, to demand information from York. If the contract was to vest in B–H the right to conduct unlimited quasi judicial review without the safeguards normally associated with such procedures, it must state so explicitly, and it does not.

In view of the court's denial of the motion to dismiss, the discovery motions are also denied.