**In re: AMERICAN MEDICAL IMAGING CORPORATION Debtor.**

**NATIONWIDE LIFE INSURANCE COMPANY Plaintiff,**

**v.**

**AMERICAN MEDICAL IMAGING CORPORATION Defendant.**

**Bankruptcy No. 91–14235S.
Adv. No. 91–0825S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 31, 1991.

James M. Matour, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for debtor.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Robert Lapowsky, Cohen, Shapiro, Polisher, Sheikman & Cohen, Philadelphia, Pa., for plaintiff.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding presents elusive issues regarding the determination of the date of termination of a group life and health insurance policy for the benefit of the Debtor corporation's employees and the impact upon the employees' benefits when the Debtor failed to make timely payments

of policy premiums. Revising our own previous tentative conclusion, we hold that the policy in issue has never been terminated because the terms under which it was to be terminated became muddied through ambiguous oral modifications and because the insurer never provided any notice of its intention to terminate it to the Debtor.

However, since the policy in issue was an executory contract on the date of the filing of the Debtor's petition in bankruptcy, we reject the Debtor's argument that payment of only post-petition premiums will render the policy effective through its post-petition date of mutual cancellation. Instead, we hold that the Debtor must promptly move to assume the policy and cure all defaults therein and that, only failing such an assumption, will the contract be deemed rejected.

Finally, we further hold that, if the insurance contract is rejected, and thus terminated, the Debtor's employees are entitled, pursuant to applicable state law as interpreted by an intermediate appellate state court, to a 90–day period after notice of the policy's termination to exercise their conversion rights under the policy.

## B. PROCEDURAL HISTORY

On July 31, 1991, AMERICAN MEDICAL IMAGING CORPORATION ("the Debtor") filed the voluntary Chapter 11 bankruptcy case underlying this proceeding. On September 6, 1991, NATIONWIDE LIFE INSURANCE COMPANY ("the Plaintiff") initiated the instant proceeding by filing a Complaint for Declaratory Judgment regarding its rights under its group life and health insurance policy with the Debtor. Expedited scheduling of the trial was sought by the Plaintiff because of its concern that the action of ceasing to honor claims of the Debtor's employees as of August 20, 1991, could be contended by the Debtor to be a violation of the automatic stay arising from the Debtor's bankruptcy filing. We accommodated the Plaintiff and scheduled the trial of the proceeding on September 25, 1991. At trial, we learned that some of the urgency had been dispelled by the Debtor's re-

placement of the Plaintiff by a new insurance carrier on September 16, 1991. After trial, we directed the parties to submit proposed Findings of Facts and Conclusions of Law which, after brief extensions, were submitted on October 3, 1991, and October 11, 1991, respectively.

The within Findings of Fact were drawn from live testimony at trial by Brenda Flask, the supervisor of the Plaintiff's Phoenix and Los Angeles Service Center, and Leo J. Pound, the Debtor's chief executive officer; and from the telephonic testimony of Robert Nelson, the group sales manager of the Plaintiff's Phoenix office.

## C. FINDINGS OF FACT

1. The Debtor, as Plan Sponsor, entered into a group life and health Insurance Policy, No. 0–2211 ("the Policy"), with the Plaintiff on or about July 1, 1989.

2. Pursuant to the terms of the Policy, the Debtor was required to make payments on the first day of each month for insurance coverage for the succeeding month. The Policy included the following paragraph regarding a grace period of payment:

> [a] 31–day grace period follows the due date of an unpaid premium, unless we [the Plaintiff] receive written notice before the due date to cancel insurance as of that due date.... The Plan Sponsor must pay a pro rata premium for any coverage provided during a grace period.... Insurance will stay in force during the grace period. *If all the premium is not paid prior to the expiration of the grace period, the Policy will terminate on the last day of the grace period* (emphasis added).

3. The Policy does not require that notice of termination be provided to the Debtor or to the employees covered. The entire contract between the Debtor and the Plaintiff consisted of the Policy, the Debtor's Application, and the applications for inclusion in the Policy coverage by the Debtor's employees.

4. In the "Term of Policy and Renewal Privilege" paragraph of the Policy, it was provided that the policy continued as long

as the premiums were paid, or until the Policy was cancelled. The former basis for cancellation of the Policy is consistent with the language in the paragraph quoted in Finding of Fact 2, page 47 *supra,* since, in both paragraphs, the non-payment of insurance premiums triggers termination of the Policy. The Policy states, as to the Plaintiff's rights to cancel it, that

[w]e *may* cancel the insurance as of a premium date with a 31–day advance notice in writing to the plan sponsor [the Debtor] (emphasis added).

5. The Policy stated that the individual insured employees, as well as their dependent spouses, had certain privileges to convert the benefits from the group policy to an individual policy upon the termination of the group policy, and recited the procedures for exercising these conversion privileges. Regarding these conversion privileges, as to the base plan and major medical components, the Policy notified the individual insureds of their conversion privileges as follows:

You [the individual insured] will be given written notice of the conversion privilege and its duration from the plan sponsor [the Debtor]. Notice given to you [the individual insured] in person or mailed to your last known address will be considered adequate notice. If this notice is not given at least 15 days prior to the end of the thirty-one day conversion period, the time allowed for the exercise of the conversion will be extended until 15 days after the day the notice is sent. In no event will the time allowed for the exercise of the conversion privilege extend more than 90 days from the day your coverage ends under this policy.

6. During the initial "writing" of the Policy, Art Pappas, a duly-authorized agent of the Debtor, negotiated an oral agreement with Nelson for a deferral of the cancellation of the benefits of the Policy ("the Deferral Agreement"). According to the terms of the Deferral Agreement, the Debtor would have an additional sixty (60) day extension to make premium payments beyond the normal thirty-one (31) day grace period.

7. The parties stipulated that Flask was the "custodian" of the Plaintiff's billing and payment records. Flask testified that the Policy was made on a "occurrence-made" basis, *i.e.,* the Plaintiff was liable for payment of any insurance claims incurred before the expiration of the Policy. Although not a party to the Deferral Agreement, Flask testified to the manner in which the Plaintiff interpreted it and had administered it. She testified that the Plaintiff understood that, at the expiration of the grace period, the Debtor had an additional sixty (60) days within which to remit payment to the Plaintiff. During the grace period and the additional sixty (60) day period, the Plaintiff would process claims submitted under the Policy. However, if a premium payment was not remitted before the expiration of the Deferral Period, the Plaintiff understood that the Policy would terminate retroactively at the end of the grace period.

8. Flask also testified that, when the Plaintiff became aware that the largest of the Debtor's checks for both the April payment and the March payment had been dishonored, on August 20, 1991, the Plaintiff stopped processing, *i.e.,* paying, insurance claims under the Policy. Flask testified that about $57,000 worth of claims, arising between August 20, 1991, and September 18, 1991, have not been processed.

9. Nelson testified that he had been responsible for "writing" the Policy and stated that he was involved in the negotiating the terms of the Deferral Agreement with Pappas. Nelson further stated that, at the time that he and Pappas were negotiating the terms of the Policy as to the Debtor, they agreed only that the Policy would include a deferral arrangement for payment of premiums like that which had been used in an insurance policy for Pappas' former employer, Alpo Dog Food ("Alpo"). The agreement with Alpo also had been oral.

10. Nelson also testified to his understanding of that agreement, *i.e.,* that Alpo had been given sixty (60) additional days to pay the premium, but that such an extension was not to be considered a sixty (60)

day extension of the grace period or of coverage. Thus, he testified that his understanding was the same as that of Flask, *i.e.*, that if a payment were not made within 91 days, the Policy would be cancelled effective at the end of the 31–day grace period. Nelson admitted that he had never discussed these terms of the Policy with any current employee of the Debtor, such as Pound, after Pappas had left the Debtor's employ.

11. The premiums due on the Policy between March, 1991, and September, 1991, were as follows:

(1) March 1991—$22,469.27;
(2) April 1991—$21,558.66;
(3) May 1991—$20,993.70;
(4) June 1991—$20,858.07;
(5) July 1991—$23,862.46;
(6) August 1991—$21,287.99; and
(7) September 1991—$21,287.99, although presumably this figure would be reduced due to the Debtor's cancellation of the Policy on September 16, 1991.

12. The payments made by the Debtor on the Policy in 1991, which covered premiums back to October, 1990, were as follows:

| Invoice Date | Check Date | Amount | Date Cleared |
| --- | --- | --- | --- |
| 10/1/90 | 1/14/91 | $ 5,497.85 | 1/22/91 |
| 10/1/90 | 1/14/91 | $19,120.12 | 1/22/91 |
| 10/1/90 | 1/14/91 | $ 2,108.97 | 1/22/91 |
| 10/1/90 | 1/14/91 | $ 1,383.99 | 1/22/91 |
| 11/1/90 | 2/15/91 | $18,817.97 | 2/21/91 |
| 11/1/90 | 2/15/91 | $ 1,723.35 | 2/21/91 |
| 11/1/90 | 2/15/91 | $ 1,769.95 | 2/21/91 |
| 11/1/90 | 2/15/91 | $ 5,497.85 | 2/21/91 |
| 12/1/90 | 3/15/91 | $ 5,114.78 | 3/22/91 |
| 12/1/90 | 3/15/91 | $19,230.89 | 3/22/91 |
| 12/1/90 | 3/15/91 | $ 1,723.35 | 3/22/91 |
| 12/1/90 | 3/15/91 | $ 1,769.95 | 3/22/91 |
| 1/1/91 | 4/12/91 | $ 3,541.51 | 4/29/91 |
| 1/1/91 | 4/12/91 | $ 1,724.54 | 4/22/91 |
| 1/1/91 | 4/12/91 | $ 1,867.48 | 4/29/91 |
| 1/1/91 | 5/10/91 | $17,801.92 | 5/10/91 |
| 2/1/91 | 5/16/91 | $ 1,724.54 | 5/23/91 |
| 2/1/91 | 5/16/91 | $ 2,772.14 | 5/23/91 |
| 2/1/91 | 5/16/91 | $17,269.47 | 5/29/91 |
| 2/1/91 | 6/3/91 | $ 2,254.88 | 6/7/91 |
| 3/1/91 | 6/10/91 | $ 2,260.75 | 6/8/91 |
| 3/1/91 | 6/10/91 | $ 1,724.54 | 6/15/91 |
| 4/1/91 | 7/8/91 | $ 2,261.60 | 7/15/91 |
| 4/1/91 | 7/8/91 | $ 1,724.54 | 7/15/91 |

13. The premium payment due March 1, 1991, was received by the Plaintiff, in the form of three checks from the Debtor, on or about June 14, 1991. However, the largest of the three checks, in the amount of $18,483.98, was dishonored (and is there-

fore not listed on the aforesaid list of payments). The premium payment due April 1, 1991, was also received by the Plaintiff, in the form of three checks, on or about July 12, 1991. Again, the largest of the three checks, in the amount of $17,572.50, was dishonored. The Debtor failed to pay any of the premiums due for May 1, 1991, or thereafter.

14. The Debtor's only witness, Pound, testified that he was first employed by the Debtor after the negotiations between Nelson and Pappas had occurred, and the Policy was in place. He testified that he spoke to Nelson, who was his sole contact with the Plaintiff, regarding the January 1, 1991, premium payment remitted on April 12, 1991. In response to Nelson's request that the Debtor attempt to send its premium payments in a more timely manner, Pound replied that this could not be done. Pound stated that Nelson had expressed no further intention to terminate the Policy at this time.

15. Pound next related a conversation with Nelson occurring sometime in mid-July, before the Debtor filed its bankruptcy petition, during which Pound expressed a fear to Nelson that a premium payment for March, 1991, which had been sent to the Plaintiff and subsequently dishonored, had been lost. Pound asked whether he should send a replacement check. Nelson replied that he did see any reason for sending a replacement check and recommended that Pound should proceed to send the April payment. Pound did so, but the largest of the April, 1991, payment checks was also dishonored. Pound stated that he had no further pre-petition communications with Nelson.

16. Pound also testified that, due to the Debtor's unique cash-flow situation, the Debtor could and would have made up the dishonored checks and continued payments if the Plaintiff had clearly demanded such performance.

17. Pound testified that he understood that the grace period for payment and coverage of the Policy extended "into the middle of the month beyond the due date," consistent with the Debtor's history of payments to the Plaintiff, as well as the fore-

going and other unspecified discussions with Nelson. He further stated that it was his expectation that the Debtor would receive a written notice from the Plaintiff before the Plaintiff would terminate the Policy.

18. Finally, Pound testified that, in August, 1991, the Debtor had notified its employees that the Plaintiff claimed that coverage under the Policy was terminated, which caused considerable consternation among the employees. However, this notice apparently did not make reference the employees' conversion rights.

19. In June, 1991, the Debtor had approximately 110 employees. As of the trial date, only 45 remained. The Plaintiff is therefore apparently holding unprocessed claims for some persons who are no longer employees of the Debtor.

## D. CONCLUSIONS OF LAW/DISCUSSION

1. *This court is empowered to determine this proceeding.*

The Plaintiff, in its Complaint, alleged that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), without elaborating on any pertinent subsection of that statute. The Debtor admitted this allegation, also without elaboration.

■■ This proceeding is possibly a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (G), or (O). In any event, it is our belief that an allegation in a Complaint that a matter is core and admission of such an allegation in the Answer constitutes express consent on the part of both parties to this court to determine the proceeding, even if it is non-core. *See In re St. Mary Hospital,* 117 B.R. 125, 131 (Bankr.E.D.Pa. 1990). We shall therefore proceed to determine this proceeding.

2. *In light of the ambiguity of the conditions which would justify the Plaintiff's unilateral termination of the Policy, clear notice to the Debtor of its termination was a prerequisite to its effective termination.*

■■ In general, an insurance policy may be cancelled only with the consent of

both parties, unless the policy gives the right of unilateral cancellation to either or both parties. *Slater v. General Casualty Co. of America,* 344 Pa. 410, 414, 25 A.2d 697, 698 (1942). In Pennsylvania, case law has long recognized that, where there are conditions incident to the cancellation of insurance policies, *e.g.,* sending notice of policy cancellation to a plan sponsor and/or the individual insureds, such conditions must be complied with strictly, or a purported termination of the policy is deemed ineffectual. *Id.,* 344 Pa. at 414, 25 A.2d at 698; *Clairton City School District v. Mary,* 116 Pa.Cmwlth. 376, 380, 541 A.2d 849, 851 (1988); *Coppola v. Insurance Placement Facility of PA,* 386 Pa.Super. 413, 417, 563 A.2d 134, 136 (1989), *appeal denied,* 525 Pa. 582, 575 A.2d 113 (1990).

■ The Policy in issue gives both the Debtor and the Plaintiff the power to cancel it. However, as to the Debtor's right to cancel the Policy, the language is permissive. This type of cancellation of the Policy is different from the Plaintiff's unilateral right to effect a cancellation/termination of the Policy following the non-payment of a premium, which is authorized by the clause quoted in Finding of Fact 2, page 47 *supra.* Pursuant to this clause, the non-payment of a premium as of the last day of the grace period terminates insurance coverage under the Policy, without the necessity of notice, written or oral, by the Plaintiff. Thus, if the Policy were unaltered, its express language would provide that notice need not be given to the Debtor by the Plaintiff for the Policy to terminate upon the Debtor's non-payment of premiums.

In the adversary proceeding at bar, the Plaintiff argues that not only did non-payment of the full March or April premium payments result in termination of the Policy, but also that the termination was *retroactive* to the expiration date of the applicable grace period for the March payment. However, it must be recalled that the Plaintiff accepted and has not refunded the portions of the March and April payments for which payments were not dishonored. Furthermore, the Plaintiff continued to process the claims of the Debtor's employees through August 20, 1991. We do not understand the Plaintiff to be contending that its payment of any processed claims should, or even could, be undone. Finally, we note that, in Count II of the Complaint, the Plaintiff alternatively requests a declaration that, if the Policy were found not to have been terminated pre-petition, it should be deemed terminated as of September 30, 1991, if the payments are not paid in full by September 29, 1991, in light of the application of 11 U.S.C. § 108(b). Such relief would certainly not be opposed by the Debtor now, because it obtained replacement insurance coverage as of September 16, 1991. The acquisition of replacement insurance also reduced the stakes of this dispute. All that is apparently in issue is the Plaintiff's obligation to insure the Debtor's employees between August 21, 1991, and September 15, 1991, a 25–day period.

Irrespective of the terms of the written Policy,

"[t]he law is crystal clear that a written contract may be modified orally, *Consolidated Tile & Slate Co. v. Fox,* 410 Pa. 336, 341, 189 A.2d 228 (1963) [,] [e]ven where the contract provides that any such written modification will not be recognized. *Wagner v. Graziano Construction Co.,* 390 Pa. 445, 448, 136 A.2d 82 (1957)."

*In re Franks,* 95 B.R. 346, 352 (Bankr. E.D.Pa.1989), quoting *Wymard v. McCloskey & Co.,* 217 F.Supp. 143, 147 (E.D.Pa. 1963).

The parties agree that the terms of the Policy recited at Finding of Fact 2, page 47 *supra,* have indeed been modified by a subsequent oral agreement. They disagree only over what the precise terms of that modification were.

In determining what terms of the modification are legally enforceable, we are guided by several pertinent facts and legal principles. Several of the pertinent facts are recited three paragraphs *ante,* at page 51 *supra.* Another pertinent fact is the parties' payment history, recited in Finding of Fact 12, page 49 *supra,* which establishes

that the Debtor consistently paid its premiums beyond even the 91–day grace period. Yet another pertinent fact is the casual manner in which Nelson initially treated the dishonor of the large June, 1991 payment, described at Finding of Fact 15, page 50 *supra.*

One pertinent legal principle was misstated by this court in the course of the trial of September 25, 1991, which is the single most important factor explaining the change in our position on the issue of the effective date of termination of the Policy. At trial we expressed a belief that it was a principle of Pennsylvania law that a contract obligee's failure to demand strict compliance with the date that an installment payment was due from the obligor under a contract in the past did not excuse the obligor's failure to comply with a payment deadline in the future. We therefore stated that, although we believed that the oral modification of the Policy provided the Debtor with a clear 60–day grace period, the Plaintiff's consistent acceptance of payments made after the 60–day period could not extend the grace period any further. Therefore, we opined that the Policy terminated 60 days after the 31–day grace period set forth in the Policy, *i.e.,* on or about May 31, 1991.

Subsequent research has convinced us that our preliminary conclusion on September 25, 1991, was incorrect. Rather, in *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285–86, 199 A. 139, 141 (1938), the Pennsylvania Supreme Court recites

the well-known principle that, where a contract provides for payments at certain times, and for forfeiture upon default, but the creditor, either by inaction or by an affirmative course of dealing, misleads the debtor into the belief that strict regularity of payments will not be insisted upon, he cannot thereafter declare a forfeiture unless he first gives reasonable notice to the debtor that in the future he will demand performance at the precise times specified in the contract.

*Accord, Warner Co. v. MacMullen,* 381 Pa. 22, 29, 112 A.2d 74, 77–78 (1955); and *First Mortgage Co. of PA. v. Carter,* 306 Pa.Super. 498, 504, 452 A.2d 835, 837–38 (1982).

It must also be recalled that the Plaintiff is seeking to effect a forfeiture of the Debtor's rights (and the rights of its employees) under the Policy. In *C & C TV & Appliance, Inc.,* 97 B.R. 782, 786 (Bankr. E.D.Pa.), *aff'd,* 103 B.R. 590 (E.D.Pa.1989), we observed that, in Pennsylvania, there is a

body of law, cited by us in *In re Sudler,* 71 B.R. 780, 785 (Bankr.E.D.Pa.1987),

"which has termed forfeitures as 'odious,' *Arcon Development Corp. v. United States,* 409 F.Supp. 671, 673 (W.D.Pa.1976); 'disfavored,' *Barraclough v. Atlantic Refining Co.,* 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974); and 'abhorrent,' *In re Kam Dam Marina, Inc.,* 20 B.R. 414, 416 (Bankr.W.D.Pa.1982); and *Jackson v. Richards 5 & 10, Inc.,* 289 Pa.Super. 445, 452, 433 A.2d 888, 892 (1981)."

At trial, we indicated that we rejected the Plaintiff's argument, as articulated by Flask and Nelson, that the grace period accorded to the Debtor was merely an additional time in which to make payment, but which allowed the Plaintiff, in the event that payment was not made during the grace period, to terminate the contract retroactively to the end of the 31–day grace period established in the Policy. Although there is undisputed evidence of an oral modification of the strict rights of the Plaintiff to terminate the policy, the evidence of the precise terms of the modification to the agreement is very hazy. The modification was the product of an oral agreement between Nelson and Pappas, the substance of which incorporated a prior, equally hazy oral agreement in an insurance policy between the Plaintiff and Pappas' former employer, Alpo. Nelson was unable to relate any recitation of the specific terms of this "agreement" by or with Pappas during his employ with either the Debtor or with Alpo, or with any other agent of the Plaintiff.

Several factors cause us to conclude that the agreement between Nelson and Pappas should be construed to extend the grace

period for extension of coverage, not merely extend the time-period for payment. The first is the observation that the grace period provided in the Policy is expressed in terms of a grace period of coverage. If all that passed between Nelson and Pappas was an agreement to extend "the grace period," as it appears was the case, then it appears logical to assume that the parties intended to extend the period of coverage. It is counterintuitive to assume that they agreed to the rather convoluted partial extension of the grace-period, as described by Flask and Nelson. *Cf. Perry v. Middle Atlantic Lumbermens Ass'n,* 373 Pa.Super. 554, 566–67, 542 A.2d 81, 87–88, *appeal denied,* 520 Pa. 618, 554 A.2d 510 (1988) (court rejects insurance industry argument that an insurer's failure to comply with statutory notice requirements merely extends the time-period in which the insured can exercise a conversion privilege, holding instead that coverage is extended for the statutory "grace period").

Secondly, the Plaintiff took no action inconsistent with the conclusion that there was an extension of coverage during the grace-period. It accepted payments beyond the 91–day period. It continued processing claims until August 20, 1991, almost six months after the Debtor's failure to make a substantial portion of the premium payment due on March 1, 1991. It sent no notice to the Debtor explaining its interpretation of the extension of the Debtor's rights. In sum, all of its actions, through August 20, 1991, were consistent with an extension of coverage over the term of the grace period.

Thirdly, any ambiguity in the agreement between the parties must be construed against the Plaintiff insurer. As we recently stated in *In re CS Associates,* 121 B.R. 942, 954 (Bankr.E.D.Pa.1990), quoting *In re Leedy Mortgage Co.,* 76 B.R. 440, 446 (Bankr.E.D.Pa.1987),

"the law of Pennsylvania, as interpreted by the state courts and the federal courts in deciding cases involving insurance coverage, is that

'because insurance policies are frequently considered to be contracts of adhesion, any ambiguity in the policy "must be construed against he insurer, and in a manner which is more favorable to coverage." *Houghton v. American Guar. Life Ins. Co.,* 692 F.2d 289, 291 (3d Cir.1982) (quoting *Buntin v. Continental Ins. Co.,* 583 F.2d 1201, 1207 [3d Cir.1978]).'

*See also, e.g., Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.,* 821 F.2d 216, 220 (3d Cir.1987); *Shishko v. State Farm Ins. Co.,* 553 F.Supp. 308, 312 (E.D.Pa.1982); *Wierbinski v. State Farm Mut. Auto. Ins. Co.,* 477 F.Supp. 659, 662 (W.D.Pa.1979); and *Weiss v. CNA,* 468 F.Supp. 1291, 1293 (W.D.Pa.1979). In decisions such as *Ranieli v. Mutual Life Ins. Co.,* 271 Pa.Super. 261, 413 A.2d 396, 400 (1979), the state courts have held that 'it is well settled that insurance policies are in essence contracts of adhesion, and consequently, any ambiguities or uncertainties in language are construed strictly against the insurer and in favor of coverage.'"

We therefore reaffirm our tentative conclusion of September 25, 1991, that the oral modification of the terms under which the Plaintiff could effect unilateral termination of the Policy effected an extension of coverage. However, in line with the reasoning of *Warren Tank Car, supra,* we decline to reaffirm our tentative conclusion that the Plaintiff's conduct could not further extend the grace period beyond the 91–day period resulting from the Deferral Agreement. Rather, we conclude that no forfeiture of the Debtor's rights could occur until the Plaintiff provided the Debtor with "reasonable notice" of precisely what performance was needed from the Debtor to retain the benefits of the Policy and that, in the absence of such performance, the Policy would terminate.

In reaching this conclusion, we note that we are cognizant of the principle that the mere acceptance of a late premium payment by an insurer does not in and of itself provide an insured party with a grace period. *See Counties Contracting & Construction Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1061 (3d Cir.1988);

*Schifalacqua v. CNA Ins.,* 567 F.2d 1255, 1258 (3d Cir.1977); and *Lantz v. Vermont Life Ins. Co.,* 139 Pa. 546, 559–61, 21 A. 80, 84–86 (1891). However, in those cases, the insured had not proven, as has the Debtor here, that the premium payments made by the insured beyond the specified grace-period had been consistently tolerated by the insurer and were therefore reasonably relied upon by the insured. Clearly, the Debtor was misled and prejudiced by the assurances, both express and implied, from Nelson and from the Plaintiff's course of action, respectively, that coverage would remain in place despite the Debtor's having remitted premium payments beyond even the extended grace-period. Partial premiums were paid which have not been refunded.

We found the result attained here totally consistent with the result of *Poch v. Equitable Life Assurance Soc'y,* 343 Pa. 119, 126–27, 22 A.2d 590, 593–94 (1941). That case concluded, prior to the enactment of legislation protecting the conversion rights of employees of companies providing group accident and sickness insurance, *see* pages 56–57 *infra,* that termination of an employee's conversion rights must be preceded by "reasonable notice." We conclude that such "reasonable notice" must also be provided to the Debtor before the Policy could be terminated as to it.

The Plaintiff submitted no evidence that any notice that the Policy would be terminated was provided to the Debtor at any time prior to its cessation of processing claims of the Debtor's employees. As Pound explained, had reasonable notice of the Debtor's responsibilities to retain coverage, with a warning that termination of the Policy would transpire upon the Debtor's failure to effect such performance, the Debtor may well have been able to make up for the dishonored checks and have continued making premium payments. The Debtor's capacity to pay for such coverage is supported by its prompt retention of replacement coverage from, presumably, a new carrier. We believe that, under these circumstances, appropriate notice was a prerequisite to termination of the Policy and that, in light of the fact that such notice was not provided, the Policy cannot be deemed terminated as to the Debtor.

3. *Since the Policy was an executory contract at the time of the bankruptcy filing, the Debtor can avoid its ultimate termination only by assuming this contract and curing all payment defaults; however, the impracticality of the Debtor's exercising its right to assume the contract causes us to invoke 11 U.S.C. § 365(d)(2) to force the final determination of the parties' rights.*

We have therefore sustained the Debtor's contention that the Policy was never validly terminated by the Plaintiff prior to its mutual cancellation on September 16, 1991. However, we cannot accept the Debtor's further argument that the Plaintiff is obliged to pay the approximately $57,000 in outstanding claims to the Debtor's employees upon the Debtor's payment of only post-petition premiums, which are apparently in the neighborhood of $30,000. *See* Finding of Fact 11, page 49 *supra.* This is because, at the crucial time of the filing of the Debtor's bankruptcy petition, the Policy was an executory contract, and the Debtor is entitled to the benefits of such a contract only if it assumes its burdens.

In *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989), the court states that,

[a]lthough the Bankruptcy Code contains no definition of an executory contract, courts have generally relied on the following definition: "[an executory contract is] a contract under which the obligation of both the bankruptcy and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn.L.Rev. 439, 460 (1973). *See, e.g., Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1045 (4th Cir.1985) (relying on Countryman's definition), *cert. denied,* 475 U.S.

1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *see also N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984) (although Bankruptcy Code provides no definition of executory contract, legislative history of § 365(a) defines the term to mean a contract on which performance remains due on both sides); *In re KMMCO, Inc.,* 40 B.R. 976, 978 (E.D.Mich.1984) (executory contracts are those under which neither party has fully performed) (footnote omitted).

*See also In re W. & L. Associates,* 71 B.R. 962, 964–66 (Bankr.E.D.Pa.1987) (suggesting an even broader interpretation of the term "executory contract").

As we observed in *In re Metro Transportation Co.,* 87 B.R. 338, 341–42 (Bankr. E.D.Pa.1988), the crucial date for analysis of whether a particular contract is an executory contract or not is the date of the filing of the debtor's bankruptcy petition. Thus, a rejection of a contract is effective as of the time immediately before the filing of a bankruptcy petition. *See* 11 U.S.C. § 365(g)(1).

The question of whether an insurance contact is an executory contract was raised by the court in *Counties Contracting, supra,* 855 F.2d at 1060, and it expressed an "inclination" to find that such a contract was indeed executory. Many courts agree that such a contract, if not terminated prepetition, is indeed an executory contract. *Accord, e.g., Aetna Cas. & Surety Co. v. Gamel,* 45 B.R. 345, 348 (N.D.N.Y.1984); *In re Pester Refining Co.,* 58 B.R. 189, 190–91 (Bankr.S.D.Iowa 1985); *In re B. Siegel Co.,* 51 B.R. 159, 161–64 (Bankr. E.D.Mich.1985); and *In re Garnas,* 38 B.R. 221, 223 (Bankr.D.N.D.1984). *Cf. In re Amatex Corp.,* 107 B.R. 856, 860–61 n. 2 (E.D.Pa.1989), *aff'd,* 908 F.2d 961 (3d Cir. 1990) (liability insurance policies covering a term which ended several years prior to debtor's bankruptcy filing held subject to assumption despite court's impression that

the policies were no longer executory contracts because the debtor's duties at the time of the filing of the case were minimal).

■ There is little doubt that, if the Policy was not, as we have already held,[1] terminated as of July 31, 1991, it was a contract under which both parties were required to perform material obligations. The Debtor was obliged to continue (or, more accurately, resume making) premium payments. In consideration therefor, Plaintiff was obliged to continue to process the claims of the Debtor's employees, which it continued to do through August 20, 1991. Therefore, the *Sharon Steel* definition of an executory contract is satisfied as to the Policy.

■ Consequently, the Debtor can reap the benefits of the Policy only if it chooses to fulfill its obligations under the Policy and assumes it pursuant to 11 U.S.C. § 365(b)(1). These obligations include a cure, or prompt assurance of a cure, of all defaults in payment. 11 U.S.C. § 365(b)(1)(A). The policy premium delinquencies total well in excess of $125,000. *See* Finding of Fact 11, page 49 *supra.* The claims unpaid by the Plaintiff, through September 16, 1991, were only about $57,-000. Since the Debtor has replacement insurance going forward, it is rather clear that, in light of this ruling, the Debtor will proceed to reject the Policy.

Despite the apparent inevitability of this result, it is necessary that we require that the Debtor formally reject the Policy in order for us to deem it rejected. *See Metro Transportation, supra,* 87 B.R. at 342; and *In re New York City Shoes, Inc.,* 84 B.R. 947, 960–61 (Bankr.E.D.Pa.1988). Although the Plaintiff has not invoked 11 U.S.C. § 365(d)(2), consistent with its contention that the Policy is not an executory contract, *see* page 55 n. 1 *supra,* we believe that relief under that Code section is appropriate to effectuate the general relief sought by the Plaintiff: a declaration of its

---

1. The Plaintiff prayed for a declaration, in Count II of its Complaint, that the Policy was *not* executory. However, this prayer must be considered in the context of the Plaintiff's assertion that the Policy had terminated pre-petition.

We have no doubt that it would contend that the Policy was an executory contract if it were faced with our instant determination that the Policy was not terminated as of the filing date.

rights vis-a-vis the Debtor. We will therefore include in our Order a directive that the Debtor move to assume the Policy in about 30 days, *i.e.*, on or before December 2, 1991, or we will deem the Policy rejected by the Debtor.

4. *The employees of the Debtor have a right to a period of 90 days after any rejection of the Policy by the Debtor to exercise their conversion privileges arising from the Policy, and notice of this right.*

 If the Debtor opts to assume the Policy, the Plaintiff will, in all probability, be only too happy to process all of the claims of the employees of the Debtor under the Policy through September 16, 1991. However, for purposes of the following discussion, we will make what we believe is the logical assumption that the Debtor will reject the Policy. That scenario compels us to address and resolve the issue to which the parties devoted most of their attention in their post-trial submission: what rights do the "real" insured parties, *i.e.*, the Debtor's employees, have vis-a-vis the Plaintiff if the Policy is terminated?

Three cases address this issue, *Olkowski v. Prudential Insurance Co.* 597 F.Supp. 1197 (E.D.Pa.1984); *Poch, supra;* and *Perry, supra.* All of these cases hold that plaintiff-employees are entitled to notice and an opportunity to exercise their conversion rights, in the absence of which, as here, these rights remain intact.

*Poch* establishes, 343 Pa. at 128, 22 A.2d at 594, that

under a group policy like that now before us, the insured employee must be regarded as a party to the insurance contract at least to the extent that the group policy cannot be cancelled or any of its effective provisions eliminated, by either the employer or insurer, except in a manner provided by the policy, without giving such employee notice of the intended cancellation or modification, so that he may timely exercise any conversion privilege which may be available to him under the terms of the policy or, where such privilege is not given, in order that he may seasonably obtain similar insurance protection on his own account elsewhere; further, that in the absence of notice, an agreement of cancellation or modification like that here entered into between the [insured] and the [insurer] is, as to such employee, legally ineffective to relieve the insurance company from liability under the original policy.

This holding was codified in 1976 in legislation, 40 P.S. §§ 756.2(d)(4), (19), which provides, in pertinent part, as follows:

(d) A group policy delivered or issued for delivery in this state which provides hospital, surgical or major expense insurance, or any combination of these coverages, on an expense incurred basis, ... shall provide that an employee or member whose insurance under the group policy has been terminated for any reason, including discontinuance of the group policy in its entirety or with respect to an insured class, and who has been continuously insured under the group policy (and under any group policy providing similar benefits which it replaces) for at least three months immediately prior to termination, shall be entitled to have issued to him by the insurer a policy of health insurance (hereafter referred to as the converted policy). An employee or member shall not be entitled to have a converted policy issued to him if termination of his insurance under the group policy occurred because he failed to pay any required contribution, or any discontinued group coverage was replaced by similar group coverage within thirty-one days. Issuance of a converted policy shall be subject to the following conditions:

. . . . .

(4) The effective date of the converted policy shall be the day following the termination of insurance under the group policy.

. . . . .

(19) A notification of the conversion privilege shall be included in each certificate of coverage.

Each certificate holder in the insured group shall be given written notice of such conversion privilege and its duration within fifteen days before or after the date of termination of group coverage, provided that if such notice be given more than fifteen days but less than ninety days after the date of termination of group coverage, the time allowed for the exercise of such privilege of conversion shall be extended for fifteen days after the giving of such notice. If such notice be not given within ninety days after the date of termination of group coverage, the time allowed for the exercise of such conversion privilege shall expire at the end of such ninety days. Written notice by the contract holder given to the certificate holder or mailed to the certificate holder at his last known address, or written notice by the insurer mailed to the certificate holder at the last address furnished to the insurer by the contract holder, shall be deemed full compliance with the provisions of this clause for the giving of notice. A group contract issued by an insurer may contain a provision to the effect that notice of such conversion privilege and its duration shall be given by the contract holder to each certificate holder upon termination of his group coverage.

In *Olkowski,* Chief Judge Bechtle, citing to and quoting from *Poch,* but not referencing the above legislation, held that an employee who did not receive notice of his conversion right was covered by a group health and life insurance policy even though the policy, by its terms, was terminated "automatically" when the employer failed to pay all necessary premiums.

In *Perry,* the Pennsylvania Supreme Court, in a suit by an employee situated similarly to that in *Olkowski,* reached the same result through interpretation and application of 40 P.S. § 756.2(d)(19). Although the second sentence of this statute is hardly pellucid, the Superior Court, invoking, *inter alia, Poch, Olkowski,* and the legislative history of 40 P.S. § 756.2(d)(19) indicating an intention to give thereby broad protection to employees covered by group health insurance, holds, 373 Pa.Super. at 566, 542 A.2d at 871, as follows:

This provision unequivocally imposes a joint obligation on the insurer and the group policy holder to notify the insured of his conversion privilege. In the event that the insured is not provided with written notice of the termination of insurance or his option to convert to a policy of individual insurance within ninety (90) days from the termination of group coverage, the insurer remains liable under the group policy until such notice is provided to the insured. Additionally, when notice is sent more than ninety (90) days from termination of group coverage, the time for the exercise of the privilege provided in the policy is extended for ninety (90) days.

If we follow this holding of *Perry,* the employees of the Debtor must be accorded notice of the termination of the Policy and a 90-day period to exercise their conversion rights before these rights are cut off.

The Plaintiff attempts to avoid this apparently inevitable result with a series of arguments, all of which can be readily rejected. It argues that the termination provision in the instant Policy is "unequivocal." However, it is unable to distinguish the terms of the instant Policy from that of the purportedly-less-unequivocal policies in *Poch, Olkowski,* and *Perry.* Furthermore, we have previously held, *see* pages 52–53 *supra,* that the parties' vague oral modification of the conditions for termination rendered the instant Policy ambiguous on this point.

The Plaintiff also argues that *Poch, Olkowski, Perry,* and 40 P.S. § 756.2(d)(19) address only rights of the employees themselves, and should not aid the Debtor in its arguments that the Policy has not been terminated as to it. We agree that these authorities are not decisive of the Debtor's rights. However, we have already concluded, on independent grounds, that the Policy is not terminated as to the Debtor. *See* pages 50–54 *supra.*

The Plaintiff further argues that the Debtor lacks standing to argue on behalf of the employees. However, if this is so,

the only result would be a decision limited to a declaration of the rights of the parties *inter se.* We note that the Plaintiff, although it possibly violated Bankruptcy Rule 7019 and Federal Rule of Civil Procedure 19(a), (b) by not joining the employees as parties to the proceeding, vigorously presented evidence and arguments relating to the rights of the employees.

The Plaintiff also argues that the Debtor, and not it, was obliged to provide notice to the employees of their conversion rights, and that therefore the Plaintiff should not suffer any detriment due to the *Debtor's* failure to provide the employees with adequate notice. *See* the Policy provision quoted at Finding of Fact 5, page 48 *supra.* However, the Debtor was uncertain whether the Policy was terminated, and has successfully argued, contrary to the Plaintiff's contentions, that it was *not* terminated at all. It therefore seems impractical for the Plaintiff to have expected the Debtor to have provided notice that the Policy *had been* terminated to its employees. In any event, the Debtor's failure to satisfy this Policy provision should not eliminate the employees' conversion rights. They run until *some* responsible party provides the requisite notice. Obviously, it would have served the Plaintiff's interests to have made certain that the notice had been accurately and timely provided by giving the notice itself.

■ Finally, and most vigorously, the Plaintiff argues that *Perry* incorrectly interpreted the second sentence of 40 P.S. § 756.2(d)(19), and that therefore we should reject the interpretation of this legislation offered in that case. However, as a federal court applying Pennsylvania law, we are obliged to give "considerable weight" to intermediate appellate decisions of the Pennsylvania Superior Court. *See Sprague, Levinson & Thall v. Advest, Inc.,* 623 F.Supp. 11, 14 (E.D.Pa.), *aff'd,* 780 F.2d 1016 (3d Cir.1985); and *In re Frymire,* 96 B.R. 525, 534 (Bankr.E.D.Pa.), *aff'd in part & rev'd in part on other grounds,* 107 B.R. 506 (E.D.Pa.1989). Superior Court decisions have not been followed when they are inconsistent with decisions of the Third

Circuit Court of Appeals (*Sprague, supra*) or decisions of the Pennsylvania Supreme Court (*Frymire, supra*). *Perry* is a lengthy, thoughtful Opinion which appears directly supported by the Chief Judge of the court which reviews our decisions (*Olkowski*) and the Pennsylvania Supreme Court (*Poch*). We are therefore strongly inclined to follow the holding of *Perry* and will do so.

We will accordingly declare that the conversion rights of employees of the Debtor will not expire unless and until they are provided with 90 days' notice of their said conversion rights, after any termination of the Policy becomes effective.

### E. CONCLUSION

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 31st day of October, 1991, after the trial of the proceeding on September 25, 1991, and upon careful consideration of the parties' post-trial submissions, it is hereby

ORDERED AND DECREED that the rights of the parties in Group Life and Health Policy No. 0–2211 ("the Policy") issued by the Plaintiff, Nationwide Life Insurance Company ("the Plaintiff") to the Defendant–Debtor American Medical Imaging Corporation ("the Debtor") are as follows:

1. The Policy has not been terminated as to the Debtor or the Debtor's employees.

2. The Policy was an executory contract within the scope of 11 U.S.C. § 365.

3. The Debtor shall file any motion to assume the policy on or before December 2, 1991. If it fails to do so, or if such a motion is denied after notice and a hearing, the Policy shall be deemed rejected and shall be declared terminated upon its rejection.

4. If and when the Policy is terminated, any employees of the Debtor covered thereby shall retain their conversion rights under the Policy unless and until the said employees are, after its termination, given

at least 90 days reasonable and adequate notice of the manner in which they may exercise such conversion rights.