In re Thomas John BOTTER, Debtor.

In re Jennifer Marie Bechtel a/k/a
Jennifer Hollister, Debtor.

Nos. 95–41597–13, 97–41733–13.

United States Bankruptcy Court,
D. Kansas.

July 6, 2000.

Thomas A. Valentine, Thomas A Valentine P.A., Topeka, KS, for Rubber Workers Local 307 Federal Credit Union.

Danton C. Hejtmanek, Bryan Lykins & Hejtmanek P.A., Topeka, KS, for Jennifer Marie Bechtel.

Mark Neis, Neis and Michaux, Topeka, KS, for Thomas John Botter.

Jan Hamilton, Topeka, KS, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Chief Judge.

These matters are before the Court for resolution of a creditor's application for an administrative expense in each case. The creditor, Rubber Workers Local 307 Federal Credit Union ("Credit Union"), appears by counsel Thomas A. Valentine. Debtor Jennifer Marie Bechtel appears by counsel Danton C. Hejtmanek. Debtor Thomas John Botter appears by counsel Mark W. Neis. After due consideration of the relevant pleadings, the Court concludes it must deny the Credit Union's motions.

### FACTS

*I. Thomas John Botter*

Mr. Botter filed his chapter 13 petition and proposed plan of reorganization in August 1995. He checked a box on Schedule G to indicate that he had no executory contracts or unexpired leases. His plan provided for the Credit Union's claim of $5,650 to be paid in full because a divorce decree required him to pay the debt. Apparently, a car that secured the debt was awarded to his former spouse in the divorce. As a result of the divorce decree, even though no property of the estate secures it, the Credit Union's claim was to be paid interest at the contract rate as a special class, rather than at the ordinary discount rate provided to secured creditors. Since Mr. Botter believed he had no executory contracts, his plan stated that no

executory contracts were "accepted or rejected" under the plan.

The Credit Union filed a proof of claim for $5,735.61, asserting that the claim was secured. The parties then submitted an agreed order adopting the amount stated in the proof of claim as the amount to be paid to the Credit Union, plus interest at the contract rate, under the plan. The order noted that the claim was secured by Mr. Botter's ex-wife's vehicle. Neither the Credit Union's proof of claim nor the agreed order indicated that the Credit Union had a claim against Mr. Botter for credit disability insurance premiums. The combined promissory note and security agreement that Mr. Botter gave to the Credit Union, however, a copy of which was attached to the proof of claim, clearly shows that Mr. Botter chose to purchase credit disability insurance for the loan when he obtained it. The contract states that Mr. Botter could "stop" the insurance at any time. Nothing in the contract indicates that the Credit Union could or would pay for the insurance if Mr. Botter did not. The Credit Union was authorized to pay for property insurance on its collateral if Mr. Botter failed to do so and add that cost to his debt, but not the credit disability insurance.

In the portion of the contract dealing with the disability insurance, in an area labeled "Premium Schedule," the figure $1210.23 was entered. This appears to be the amount being charged for the insurance. In the "Truth in Lending Disclosure" portion of the contract, the amount entered in the insurance area must be added to the finance charge and amount financed figures to arrive at the "Total of Payments" figure; the number of payments times the amount of the payments equals the "Total of Payments" figure. Thus, the Court can infer that Mr. Botter's monthly payments included an amount for

the credit disability insurance. As the Court understands credit disability insurance, it would do nothing more than pay Mr. Botter's obligation to the Credit Union if he became disabled; no additional benefits would be paid directly to him.

An order confirming Mr. Botter's chapter 13 plan was filed in June 1996.

In October 1999, the Credit Union filed its motion for allowance of an administrative claim, asserting for the first time that Mr. Botter had had credit disability insurance since filing for bankruptcy but had not paid for it, and therefore owed the Credit Union $517.78 in unpaid premiums as an administrative expense. Apparently, rather than paying the full charge for the insurance initially, the Credit Union paid for it in monthly installments, which it continued to pay after Mr. Botter filed for bankruptcy. Mr. Botter responded that he had canceled the disability insurance, had not agreed to pay the premiums, and could recall no postpetition contacts from the Credit Union about the insurance. He pointed out that his plan did not call for the Credit Union to be paid anything other than the value of the vehicle that secured its claim. A report filed by the chapter 13 trustee indicates the Credit Union had been paid in full under the plan by the end of June 1999. At a hearing in December 1999, the Court orally denied the Credit Union's administrative expense request. A short time later, the Credit Union filed a motion to reconsider. That motion was then combined for decision with the Credit Union's similar claim for an administrative expense in Ms. Bechtel's case.

*II. Jennifer Marie Bechtel*

Ms. Bechtel filed her chapter 13 petition and plan of reorganization in June 1997. On Schedule G, she put "None" in the space for identifying executory contracts and unexpired leases. Her plan provided that the Credit Union's claim of $13,550, although secured only by a vehicle worth somewhat less than the debt, would be paid in full at the contract rate of interest because it was a co-signed debt. *See* 11 U.S.C.A. § 1322(b)(1) (unsecured consumer debt may be treated differently than other unsecured claims if an individual is liable on the debt with the debtor). A statement in the plan indicated that executory contracts being rejected were "None"; no mention at all was made of any executory contracts being assumed.

The Credit Union filed a proof of claim for $13,135.27, alleging it to be fully secured. The parties then submitted an agreed order indicating that the Credit Union would be paid the full amount of its claim through the plan, plus interest at its contract rate. The order noted that the claim was secured by Ms. Bechtel's vehicle and that another individual was liable with her on the debt. Neither the Credit Union's proof of claim nor the agreed order indicated that the Credit Union had a claim against Ms. Bechtel for credit disability insurance premiums. The combined promissory note and security agreement that Ms. Bechtel gave to the Credit Union, however, a copy of which was attached to the proof of claim, clearly shows that Ms. Bechtel chose to purchase credit disability insurance for the loan when she obtained it. The contract states that Ms. Bechtel could "terminate" the insurance at any time. Nothing in the contract indicates that the Credit Union could or would pay for the insurance if Ms. Bechtel did not. The Credit Union was authorized to pay for property insurance on its collateral if Ms. Bechtel did not and add that cost to her debt, but not the credit disability insurance.

In the portion of the contract dealing with the disability insurance, in the area containing the "Yes" box that was checked

to request the insurance, the words "Credit Disability: Total Cost" are printed and under them the figure "$1,666.45" was entered. This appears to be the amount being charged for the insurance. This amount must be added to the finance charge and the amount financed to arrive at the "Total of Payments" figure stated in the document; in addition, the number of payments times the amount of the payments equals the "Total of Payments" figure. Thus, as in Mr. Botter's case, the Court can infer that Ms. Bechtel's monthly payments included an amount for the insurance. As indicated above, as the Court understands credit disability insurance, it would do nothing more than pay Ms. Bechtel's obligation to the Credit Union if she became disabled; no additional benefits would be paid directly to her.

An order confirming Ms. Bechtel's chapter 13 plan was filed in October 1997.

In December 1999, the Credit Union filed its motion for allowance of an administrative claim, asserting for the first time that Ms. Bechtel had had continuing credit disability insurance premiums that she had not paid, that she had not rejected this executory contract, and that the Credit Union therefore had an administrative expense claim for $1,094.09. As in Mr. Botter's case, rather than paying the full charge for the insurance initially, the Credit Union apparently paid for the insurance in monthly installments, which it continued to pay after Ms. Bechtel filed for bankruptcy. Ms. Bechtel responded that the Credit Union's proof of claim did not indicate it had an executory contract for ongoing disability insurance, and that she would have rejected such a contract if it had been included in the proof of claim. According to the chapter 13 trustee's office, as of December 1999, the Credit Union had been paid $6,287.86 in principal and interest under Ms. Bechtel's plan.

## DISCUSSION AND CONCLUSIONS

█ The Credit Union seeks to be reimbursed for credit disability insurance premiums it apparently paid on behalf of the debtors after they filed for bankruptcy, arguing reimbursement would constitute an appropriate administrative expense in each case. The Credit Union has not cited any authority for these requests, but the Court assumes it seeks allowance pursuant to § 503(a) and (b)(1)(A), which state:

(a) An entity may timely file a request for payment of an administrative expense, or may tardily file such a request if permitted by the court for cause.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

No other subsections of that statute could apply to this creditor in these cases. The Credit Union does not explain why it considers these insurance premiums to have been necessary costs and expenses of preserving these bankruptcy estates. Although § 503(a) refers to such requests as being timely or tardily made, the parties have not briefed the timeliness of the Credit Union's motions nor has the Credit Union sought permission to file its requests tardily for cause. The Court concludes, however, that it need not address the timeliness of the motions.

As a preliminary matter, the Court questions whether the Credit Union's contracts authorized it to pay for the credit disability insurance and then seek reimbursement from the debtors. While the debtors might more properly have stopped

or terminated the insurance by affirmatively reporting their intent to do so, they strongly indicated such an intent by no longer paying for the insurance. By paying for the insurance without contacting the debtors, the Credit Union at least arguably interfered with their right to cancel the insurance and acted as a gratuitous volunteer. Without deciding whether the Credit Union's actions were permitted under the contracts, the Court concludes the requests for administrative expenses must be denied in any event for a number of reasons.

The parties appear to agree that the credit disability insurance provisions in the Credit Union's contracts with the debtors are separate executory contracts. The Court is not certain this is correct. In the legislative history of § 365, Congress indicated that for bankruptcy purposes, an executory contract is one "on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong. 1st sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303. Courts typically rely on Professor Countryman's more detailed definition: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L.Rev. 439, 446 (1973); *see also 3 Collier on Bankruptcy*, ¶ 365.02[1] (Lawrence P. King, ed., 15th ed. rev.2000). Generally, insurance contracts covering future periods are considered to be executory contracts because the debtor has to pay premiums and the insurance company has to provide coverage and process claims. *See, e.g., In re American Medical Imaging Corp.*, 133 B.R. 45, 54–56 (Bankr.E.D.Pa. 1991).

Here, though, the insurance provisions were a part of the overall loan agreements the debtors had with the Credit Union, not independent contracts they had directly with insurance companies. The Credit Union was not the company supplying the insurance coverage or processing any claims. Instead, its only obligation would appear to have been to accept the debtors' payments and forward the premiums to the insurance company or companies. The debtors' failure to pay the insurance premium portions of their monthly payments to the Credit Union would certainly have justified terminating the insurance coverage, but possibly would not have justified the Credit Union declaring the entire contract in default and repossessing its collateral. Despite the uncertainty of the executory nature of these contracts, the Court will assume that the provisions at issue are in fact executory contracts and therefore governed by § 365 of the Bankruptcy Code. Section 365(a), in relevant part, provides that "[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." In chapter 13 cases, courts generally take the view that the debtor has the power to assume or reject under § 365. *See, e.g., In re Yasin,* 179 B.R. 43, 48 (Bankr.S.D.N.Y.1995).

A chapter 13 debtor has until confirmation to assume or reject an executory contract unless, on request of any party to the contract, the court fixes an earlier time. § 362(d)(2). While § 365(d)(1) provides that, in a chapter 7 case, an executory contract is deemed rejected unless the trustee assumes or rejects it within a specified time, the Bankruptcy Code contains no similar provision for deemed rejection (or assumption, for that matter) that applies in chapter 13 cases or those under the other reorganization chapters, 9, 11, and 12. Bankruptcy Rule 6006 is also

silent about the effect of all the parties' failure to take affirmative action with respect to an executory contract. This leaves an apparent hole in chapter 13 procedure that the Credit Union is trying to exploit in these cases. In effect, the Credit Union is arguing that the debtors' obligations to reimburse it for credit disability insurance premiums automatically continued even though the Court never approved the assumption of the contracts.

The Court has found no chapter 13 decisions dealing with this situation. At least one court has declared, however, that certain leases had not been assumed in the chapter 11 phase of a case, because the court never authorized the assumption or had the opportunity to determine whether assumption would benefit the estate. *See In re Cole*, 189 B.R. 40, 46–47 (Bankr. S.D.N.Y.1995). Similarly, in these cases, the Court has never approved assumption of the insurance contracts or been asked to determine whether assumption would benefit the bankruptcy estate. In the Court's experience, debtors usually do not want to continue to pay for such insurance after they file for bankruptcy, and nothing presented indicates these debtors had any reason to want to maintain it or ran a greater than normal risk of becoming disabled. Furthermore, since the insurance provisions of the contracts clearly allowed the debtors to cancel the insurance at any time, rejection of the insurance would not have harmed the estates because the Credit Union could claim no damages for breach of contract as a result of rejection.

Assuming that their attorneys would have viewed the credit disability insurance as an executory contract when these bankruptcy cases were filed, it seems clear that Mr. Botter and Ms. Bechtel forgot they had purchased the insurance. It also appears that the Credit Union forgot about the insurance when it filed its proofs of claim in these cases, and included in its claims only the amounts still owed on the portions of the loans that were used to pay for vehicles, not the portions used to pay for the disability insurance. For purposes of bankruptcy cases, "claim" is defined in 11 U.S.C.A. § 101(5)(A), in pertinent part, to mean "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." The portion of the insurance that the Credit Union apparently paid for after each case was filed would have been unmatured on the date of filing, but certainly constituted a "right to payment" at that time. Under Bankruptcy Rule 3002(c), the usual time for filing prepetition claims is ninety days after the first date set for the meeting of creditors under § 341(a). That time expired long ago in both these cases. Since both debtors objected to the Credit Union's insurance claims, the claims would be disallowable under § 502(b)(9) if they are prepetition claims. The Court believes they are prepetition claims because they arise from the Credit Union's prepetition contracts with the debtors.

Neither of the debtors appears to have done anything that could have caused the Credit Union to think that they wanted to continue paying for the credit disability insurance. They did agree to pay the amounts the Credit Union claimed they owed it, but those amounts did not include anything for the insurance. Under the contracts, the debtors' nonpayment of the insurance premiums could at least have raised a question whether they intended to exercise their right to cancel the coverage. Furthermore, since the Credit Union was aware of these contracts that it believed were executory but the debtors obviously were not, the Credit Union would have acted more prudently if it had

asked the Court to fix a time for the debtors to assume or reject the insurance contracts, instead of remaining silent and paying the premiums for several years before seeking to be reimbursed for them. Because it failed to inform the debtors, the chapter 13 trustee, and the Court early in these cases that it was paying for this insurance, the Credit Union waived any right to seek reimbursement from the debtors. Indeed, the Credit Union not only remained silent about the disability insurance, it even affirmatively agreed with the debtors what amount they owed it and had to pay under their plans, and failed to include any insurance premiums in its claims. As stated in § 1327(a): "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." The Credit Union's claims against these debtors are therefore limited to the amounts called for by the confirmed plans.

The Court is not convinced that the Credit Union's paying for the credit disability insurance was an "actual, necessary" cost or expense of preserving these bankruptcy estates as required for it to be allowed as an administrative expense under § 503(b)(1)(A). The Credit Union has not attempted to explain how its payments might have benefitted the estates. Nothing presented indicates either Mr. Botter or Ms. Bechtel had any desire to maintain this coverage after they filed for bankruptcy, or any reason to think they ran an unusual risk of becoming disabled before they paid their debts to the Credit Union.

The Credit Union's administrative expense claims would fare no better if they could be considered to be postpetition rather than prepetition obligations (the Court does not believe they can be). In effect, the Credit Union extended credit to the debtors. Postpetition credit may be obtained under § 364(b), (c), or (d) only with the Court's approval after notice and a hearing, none of which happened in these cases. The Credit Union's claims would also not be allowable as postpetition claims under § 1305(a)(2) and (c) because the insurance was not necessary for the debtors' performance under their plans and prior approval of the trustee could have been obtained but was not.

For all these reasons, the Court concludes the Credit Union's application for an administrative expense in each of these cases must be denied.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.